T.C. Memo. 1996-168


UNITED STATES TAX COURT


NORTHWESTERN INDIANA TELEPHONE COMPANY, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ROBERT G. MUSSMAN AND MYRTIS MUSSMAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[1]


Docket Nos. 7970-91, 7971-91.      Filed April 2, 1996.


R determined that NITCO, a local telephone company, unreasonably accumulated its earnings and profits and, therefore, was subject to accumulated earnings tax. R further disallowed business deductions NITCO claimed for legal expenses and determined that NITCO was liable for certain additions to tax.

R determined that M, NITCO's president and major shareholder, had constructive dividend income and that M and M's wife were liable for certain additions to tax.

1. Held: NITCO is liable for accumulated earnings tax because its accumulated earnings exceeded its reasonable business needs and NITCO was availed of

[1]This Court granted petitioners' motion to consolidate.

to avoid income tax with respect to its shareholders.

2. Held, further, most of the legal expenses in issue are not deductible under sec. 162, I.R.C.

3. Held, further, M had constructive dividend income.

4. Held, further, NITCO is liable for the additions to tax.

5. Held, further, M and M's wife are liable for the additions to tax.

David J. Duez, Gail H. Morse, and Roger W. Wenthe, for petitioners.

Marjory A. Gilbert, Linda Grobe, and Claire McKenzie, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

Northwestern Indiana Telephone Co.
docket No. 7970-91

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | Sec. 6662 |
| 1987 | $786,115.00 | $39,305.75 | [1] | $182,675.75 | -- |
| 1988 | 429,006.00 | 21,450.30 | -- | 101,935.50 | -- |
| 1989 | 329,369.00 | -- | -- | -- | $23,509.40 |

[1] 50 percent of the interest due on $55,412.

Robert G. and Myrtis Mussman
docket No. 7971-91

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6661 | Sec. 6662 |
| 1988 | $74,850.00 | $3,742.50 | $18,712.50 | -- |
| 1989 | 127,004.00 | -- | -- | $25,400.80 |

After concessions, the issues we must decide are: (1) Whether petitioner Northwestern Indiana Telephone Co. (NITCO) permitted its earnings to accumulate beyond the reasonable needs of the business during the years 1987, 1988, and 1989; (2) whether NITCO was availed of for the proscribed purpose of avoiding income tax with respect to its shareholders and is liable for the accumulated earnings tax under section 531,[2] for 1987, 1988, and 1989; (3) whether NITCO, for 1987, 1988, and 1989, is entitled to business deductions for certain legal expenses it incurred and/or paid; (4) whether petitioner Robert G. Mussman received constructive dividend income in the years 1988 and 1989; and (5) whether petitioners are liable for additions to tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, first and second supplemental

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

stipulations of fact, and attached exhibits are incorporated herein by this reference.

At the time their petitions were filed, NITCO maintained its principal office in Hebron, Indiana, and petitioners Robert G. and Myrtis Mussman resided in Hebron, Indiana. Mr. and Mrs. Mussman filed joint individual income tax returns for 1988 and 1989.

## A. Background on NITCO and the Mussman Family

NITCO, an Indiana corporation, is an independent telephone company that provides local wire-based telephone services in the five following rural areas located in northwestern Indiana: (1) Roselawn, (2) Mt. Ayr, (3) Demotte, (4) Lakes of the Four Seasons, and (5) Hebron. It operates a local telephone company office or exchange in each of these areas. In each of the years 1987, 1988, and 1989, NITCO had a total of 7,238, 8,099, and 8,634 access lines, respectively. Most of these access lines were for residential customers. NITCO had relatively few multiline business customers. As of 1989, NITCO had 16 multiline business customers, none of whom had lines in excess of 10.

Since 1982, petitioner Robert G. Mussman (Mr. Mussman) has been NITCO's president and chief executive officer. He has owned approximately 95 percent of NITCO's outstanding shares of stock since at least 1982. The balance of NITCO's outstanding shares has been owned by Mr. Mussman's brother, Gerald Mussman. Since

1982, Gerald Mussman served as NITCO's vice president, and petitioner Myrtis Mussman (Mrs. Mussman) served as its secretary-treasurer. During the years in issue, Mr. and Mrs. Mussman and Gerald Mussman were NITCO's only directors and officers.

During 1987 through 1989 and in prior and subsequent years relevant to these instant cases, Mr. Mussman was the primary decision maker at NITCO. He made all final major decisions concerning NITCO's operation and how its earnings were spent.

Mr. and Mrs. Mussman have two sons, Rhys Mussman (Rhys) and Kyle Mussman (Kyle). Rhys was born in 1956 or 1957; Kyle was born in 1965 or 1966. Each son, at various times pertinent to the instant cases, worked as a full-time employee of NITCO. They also, at various times pertinent to the instant cases, left NITCO's employ to pursue other business ventures for their own accounts, including a cable television company business and various cellular telephone company businesses.

NITCO's local telephone business has been a family-owned and-operated business. The business was originally owned and operated by Mr. Mussman's father. Mr. Mussman began working in the business as a teenager in 1938. From about 1947 through the time of the trial in the instant cases, Mr. Mussman worked as a full-time employee in the business. Gerald Mussman left the family business in 1947 when he took a job with AT&T.

When Mr. Mussman's father died in 1954, Mr. Mussman inherited his father's NITCO shares. At various times since

1954, NITCO offered additional shares of its stock to Mr. Mussman and his brother, Gerald Mussman. Mr. Mussman purchased the shares offered to him, but his brother declined to purchase additional shares.

Throughout the 1950's, NITCO's earnings were fairly moderate. In 1951, NITCO's annual net income was about $9,800. By 1987, however, NITCO's annual revenue exceeded $5 million.

In the early 1960's, Interstate Highway 65 was constructed through NITCO's service area. The completion of the highway spurred development and economic growth in NITCO's service area, which resulted in increased annual revenue for NITCO. New subdivisions of homes were built, and portions of NITCO's service area eventually included bedroom communities composed of individuals who worked in the Gary, Indiana, area, and in the Chicago, Illinois, area.

NITCO's annual revenue and profits began to increase significantly in late 1985, as a result of the breakup of the Bell system and the entry of other companies into the long-distance telephone service market in competition with AT&T. Generally, when a long-distance telephone service company, like AT&T, originates or places a long-distance call into or from an area serviced by a local telephone company, it pays the local telephone company an access charge for the use of its lines. Prior to the breakup of the Bell system, AT&T alone established and prescribed the access charges it paid to local telephone

companies.  Following the breakup of the Bell system, an independent entity, the National Exchange Carriers Association, was established and given responsibility over deciding how long-distance call revenues were divided among all telephone service providers.

## B.  NITCO's Principal Business Office and Headquarters

From about 1980 through the time of the trial, NITCO maintained its principal business office and headquarters in an office building at 205 North Washington Street, Hebron, Indiana. NITCO leased the office building from Mr. Mussman, who owned the building and the parcel of land on which the building is situated.

Mr. Mussman also owned another smaller office building situated on the same parcel of land, with the address 301 North Washington Street, Hebron, Indiana.  Prior to its moving into and occupying the newer and larger building at 205 North Washington Street, NITCO maintained its principal business office at the 301 North Washington Street building, which it leased from Mr. Mussman.  From 1980 through 1993, NITCO continued to lease the 301 North Washington Street building from Mr. Mussman.  From 1983 until about July 1989, NITCO subleased the 301 North Washington Street office building to Rhys' cable television company.  After Rhys' cable television company vacated the premises in July 1989, NITCO used the 301 North Washington Street building for storage

and later, in the fall of 1993, moved some of its marketing division employees into the building.

From 1987 through 1989, NITCO had no plans to build other principal office facilities for itself or to expand and enlarge its offices at 205 North Washington Street.  In securing office facilities for NITCO, Mr. Mussman's longstanding practice was to own individually the office building and lease it to NITCO.  As the building's owner, Mr. Mussman, rather than NITCO, financed and constructed the building.  NITCO's respective lease agreements with Mr. Mussman on the 205 and 301 North Washington Street buildings were entered into prior to each building's construction, so that Mr. Mussman could use the executed lease agreement to secure financing from a lender to construct the building.  Mr. Mussman experienced no difficulty in obtaining loans to construct the 205 and 301 North Washington Street buildings.  The lease agreements and the mortgages on the buildings served as the security for the lender's loans to Mr. Mussman.

No enlargement of NITCO's offices at 205 North Washington Street occurred from 1987 through 1994.

### C.  NITCO's Alcatel Telephone Switching Equipment

During 1985 through 1987, NITCO replaced the old switching systems at its five exchanges with new digital switching equipment it purchased from Alcatel, a French manufacturer of

telephone switching equipment.  After it replaced the old switching equipment at its exchanges with the new Alcatel switching equipment, NITCO paid off the remaining purchase money debt of $669,530 that it owed on the old equipment to the old equipment's manufacturer.

When NITCO ordered the Alcatel E10-5 switching equipment for its five exchanges in 1985, Alcatel had represented to NITCO that Alcatel would continue to engage in research and development efforts that would allow the Alcatel equipment that was purchased to be upgraded in future years so as to offer enhanced and improved telephone services.  In 1988, NITCO purchased and installed another piece of Alcatel switching equipment, an Alcatel 1210 access tandem toll switch, at its central office. The Alcatel E10-5 switching equipment installed in NITCO's five exchanges performs switching functions in each exchange and is connected to the Alcatel 1210 tandem toll switch, which provides access to long-distance telephone service carriers, equal access, and 800 call capability to all of NITCO's exchanges.  With the E10-5 switches and the 1210 switch, NITCO can provide equal access, touch-tone services, direct long-distance dialing, call forwarding, call waiting, three-way calling, speed dialing, foreign exchange lines, pbx services, call tracing, and 911 services to all its exchanges.

In various 1990 NITCO publications circulated to NITCO's customers and employees, NITCO stated that the Alcatel switching

equipment it had installed within the past 5 years was state of the art equipment that offered the latest calling features. NITCO's operating experience with its Alcatel equipment has been good.

In an August 17, 1990, response that was submitted by NITCO to a service audit report issued by the engineering staff of the Indiana Utility Regulatory Commission (IURC), NITCO indicated that Alcatel was continuing future research and development efforts with respect to NITCO's Alcatel equipment. To support this representation, NITCO attached to its response a copy of a letter dated August 14, 1990, from Mr. James V. Parish, national sales account manager--ITT-Alcatel--stating that Alcatel was not withdrawing from the North American switching market, had no plans to do so, and was providing a complete line of support for its switching systems equipment.

From 1987 through sometime in 1992, NITCO did not obtain any bids on new switching equipment to replace its Alcatel switching equipment. In 1992, NITCO for the first time obtained a firm quotation on the price of possible replacement equipment. As of the time of trial, however, NITCO has not purchased new switching equipment to replace its Alcatel switching equipment.

### D. NITCO's Installation of Fiber Optic Cable

Although it is more costly than the traditional copper cable still extensively used by local telephone companies, fiber optic

cable has certain definite advantages over copper cable.  The fiber optic cable is much smaller in size and has a greater transmission capacity than copper cable.  It further allows higher speed transmissions and requires less maintenance than copper cable.

However, from 1987 through the time of trial, it was not economically feasible for NITCO to install fiber optic cable in the homes or business premises of its customers.  From 1986 until sometime in 1987 or 1988, Kyle was NITCO's fiber optic cable specialist.  During 1989, while he was employed as NITCO's general manager, Kyle authored and published a white paper for the independent telephone industry stating that, at that time and for the immediate future, installation of fiber optic cable by local telephone companies in residences was not economically feasible.  In the paper, Kyle expressed the opinion that there was then no economic justification for local telephone companies to incur the high cost of installing the fiber optic cable in residences, because no significant additional revenues would yet be produced for them from their installation of the cable in residences.

From 1987 through the time of trial, NITCO has not installed fiber optic cable in residences or in the business premises of its customers.  However, NITCO has installed and utilized fiber optic cable in connection with other parts of its telephone service system.  Its employees have laid and installed the fiber

optic cable.  During 1987 through 1989, NITCO was installing fiber optic cable to connect its five exchanges.  Most of this work to connect its exchanges was completed in 1987 and 1988.  In 1989, NITCO installed fiber optic cable to a point in its service area where it located a switching device to handle calls to homes using traditional copper cables.  Since 1990, NITCO has installed fiber optic cables in a few new subdivision areas to service homes in the subdivisions that had copper cables.  In addition to the fiber optic cable's better performance and reliability and its potential future capacity for offering other new or enhanced services that might become available, the fiber optic cable was cheaper to install in these subdivision areas because of its smaller size.

### E.  NITCO's Billing and Collections Work

Prior to 1986, in addition to billing and collecting payments for its own local telephone services, NITCO billed and collected payments for long-distance calls from customers in its service area who utilized AT&T's long-distance telephone services.  With respect to the long-distance payments it collected on behalf of AT&T, NITCO subtracted the access charges due to it, as well as an administrative and collection fee, and then was required to remit the balance of the long-distance payments to AT&T.

NITCO owned an IBM computer, which it used to help perform its billing and collections work.  In late 1986, AT&T took back the long-distance billing and collections function that NITCO previously performed for AT&T with respect to long-distance calls.

In October 1989, NITCO and Bank of Illinois entered into a 3-year contract under which Bank of Illinois agreed to perform NITCO's billing and collections work.  In a November 1989 NITCO publication circulated to its employees, NITCO announced that the new NITCO billing system to be operated by Bank of Illinois would help to (1) improve service to NITCO's customers, and (2) increase the productivity of NITCO's employees.  Another reason why NITCO entered into the contract was because the IBM computer that NITCO owned could not provide all the information on long-distance calls that NITCO was required to furnish to AT&T.  The contract was subsequently taken over from Bank of Illinois by another company, Communications Data Group (CDG).

As of September 1991, although it had experienced some problems with the billing and collections work done, NITCO was still utilizing CDG's billing and collections services.  At a meeting on October 25, 1991, attended by NITCO personnel and CDG personnel at the offices of NITCO's attorneys, NITCO and CDG agreed that NITCO would continue to utilize CDG's billing and collections services.  However, the problems with the billing and collections work done for NITCO persisted.

In 1992, NITCO purchased and paid approximately $781,000 for a new computer to perform its own billing and collections work. NITCO also hired additional employees to operate the new computer and to perform this work.  Thereafter, employees of NITCO utilized this computer to perform NITCO's billing and collections work.

During 1987 through 1989, NITCO had no specific and definite plans to buy a computer to perform its billing and collections work.

F.  Long Range Planning and Discussions Concerning
a Proposed Airport in or Near NITCO's Service Area

At various times during 1987 through 1989, long-range planning and discussions were taking place concerning a proposed new airport in Indiana to service the Chicago, Illinois, area. Proponents of the airport project anticipated that the proposed airport eventually would be needed, because Chicago's O'Hare airport was already being heavily used.  The proponents believed that, as O'Hare airport's maximum air traffic capacity was reached (which some of them predicted could occur as early as 2010 through 2020), much of the increased air traffic to the Chicago area would have to be accommodated at a new Indiana airport.

During the years in issue, 4 of the 15 possible sites in Indiana discussed for the proposed airport were either in or near NITCO's service area.  However, a final decision concerning the

building of the airport and the selection of its site was not likely to be made for a number of years.  As of the time of trial, no decision had yet been made concerning the building or site of the proposed airport, and there were no current plans to build the airport in or near NITCO's service area.

### G.  Cellular Telephone and Long-Distance Telephone Service License Applications Filed by Mr. Mussman, NITCO, and Another Company Mr. Mussman Controlled

In order to offer cellular telephone or long-distance telephone services in a specific area, the potential service provider must first apply for and obtain authorization from either the Federal Communications Commission (FCC) or an appropriate State regulatory agency.

During the 1980's, the FCC held lotteries to select the applicants to whom it would issue licenses to build and operate cellular telephone systems serving various areas of the United States.  The FCC issued two types of cellular telephone licenses: (1) On frequency B, only to local wire-line telephone companies, their owners, and affiliates who were under the common control of local telephone companies and/or their owners; and (2) on frequency A, to anyone else other than local telephone companies, owners of local telephone companies, and their affiliates.  If a cellular telephone licensee failed to provide the required level of cellular telephone service to the entire area covered under the license issued to it within a 5-year period, then the FCC

could take back the license to the unserviced portion of the licensee's service area and issue a new license to another qualified applicant to provide cellular telephone service to the unserviced portion of the area.

In 1988, Lukas, McGowan, Nace & Gutierrez (LMN&G), a Washington, D.C., law firm that specializes in communications law, prepared and filed with the FCC at least 78 cellular telephone license applications on behalf of either Mr. Mussman, Kyle, or Rhys. Previously, in 1986, Rhys applied for and was tentatively selected to be awarded two licenses to furnish cellular telephone services in Enid, Oklahoma, and in Asheville, North Carolina, respectively. Rhys' Enid, Oklahoma, and Asheville, North Carolina, cellular telephone business activities were conducted by him through Dial One Mobile, a company Rhys solely owned. Almost all the 78 applications LMN&G filed in 1988 were for Kyle and Rhys. During 1988, NITCO paid the filing fees with respect to the 78 license applications and deducted the payments. Petitioners have conceded that NITCO should not have deducted these payments of Mr. Mussman's, Kyle's, and Rhys' license application filing fees.

LMN&G also performed a substantial amount of other legal work for NITCO and the Mussman family during the years in issue.

Mr. Mussman's Hagerstown, Maryland, and Cumberland, Maryland-West Virginia Cellular Telephone License Applications

On or about January 6, 1988, Mr. Mussman filed with the FCC two cellular telephone license applications to provide cellular telephone services in the Hagerstown, Maryland, and the Cumberland, Maryland-West Virginia, areas, respectively. An LMN&G attorney prepared the two applications.

NITCO had no interest in the above license applications. The applications stated that Mr. Mussman was the applicant and that NITCO had no interest in the licenses being sought.

NITCO's Indiana Rural Statistical Area Number One Cellular Telephone License Application and Serv-U-Cellular, Inc.

In 1988, NITCO, certain other local wire-line telephone companies, and/or affiliates of other local wire-line telephone companies, filed competing applications with the FCC for a license to provide cellular telephone service in the rural statistical number one area in Indiana. Mr. Mussman's intention and plan was to transfer the cellular telephone license rights that NITCO obtained to Serv-U-Cellular, Inc. (Serv-U-Cellular), a corporation that he and one or more of his sons, individually, would own. At that time, when competing cellular telephone license applications were filed by local wire-line telephone companies and/or their affiliates, it was a common occurrence for some license applicants to join subsequently in a partnership to

build and operate the cellular telephone system that serviced the area.

As a result of an agreement among various applicants who sought the rural statistical number one area cellular telephone license, they agreed to withdraw their license applications to service the area as follows: (1) All the applicants except a company called Ameritech would withdraw their applications to service the area's northern portion; and (2) all the applicants would either withdraw or amend their applications so that NITCO and certain of the other applicants could form and participate in a partnership to service the area's southern portion. Subsequently, RSA #1, a limited partnership, was formed for this purpose. Ameritech further agreed to pay the other applicants $750,000 each for their agreement to cede the northern portion of the rural statistical number one area to Ameritech.

On or about September 24, 1990, an LMN&G attorney sent letters advising the other participants in RSA #1 that Serv-U-Cellular, rather than NITCO, would be a limited partner in the RSA #1 limited partnership. The attorney's letter to them stated that Serv-U-Cellular was a newly formed "subchapter S corporation" whose shares of stock were owned by individual members of the Mussman family and that Mr. Mussman would own and vote 51 percent of Serv-U-Cellular's shares.

By October 9, 1990, the RSA #1 partnership agreement was amended to reflect Serv-U-Cellular's substitution in place of

NITCO as a limited partner in the RSA #1 limited partnership. Under the original RSA #1 partnership agreement entered in mid-1989, NITCO and the other partners had agreed that subsidiaries or affiliates of a partner would be allowed to assume the partner's rights and obligations in and to the partnership.

In 1990, Serv-U-Cellular received $750,000 as a result of the agreement to cede the northern portion of the rural statistical number one area to Ameritech. NITCO received the $750,000 from Ameritech and paid it to Serv-U-Cellular.

Pursuant to Mr. Mussman's plan, Serv-U-Cellular was to be owned individually by him and Rhys. Mr. Mussman was to own 6 percent and Rhys was to own 94 percent of Serv-U-Cellular's outstanding shares of stock.

Mr. Mussman subsequently decided to abandon his plan that he and Rhys individually own Serv-U-Cellular, as a result of the Internal Revenue Service's (IRS) commencement of the examinations that led to the instant proceedings. On its 1990 return dated September 12, 1991, NITCO reported in its income $696,772 of the $750,000 payment that Serv-U-Cellular had received from Ameritech. Attached to its Form 1120 for the tax year 1991, Serv-U-Cellular notified the IRS of the termination of Serv-U-Cellular's S corporation status as a result of the transfer of all its shares to NITCO on January 1, 1991. However, on its annual reports for 1990, 1991, and 1992, to the FCC and the Indiana Utility Regulatory Commissioner (IURC), NITCO did not report that it had any subsidiaries.

<u>Dial One USA, Inc.</u>

Dial One USA, Inc. (Dial One USA), was a wholly owned subsidiary of Intelcom, Inc. (Intelcom).  Mr. Mussman was the principal stockholder of Intelcom.

In 1989, Dial One USA petitioned the IURC for a certificate of territorial authority for authorization to be a reseller of long-distance telephone services.  In connection with the petition, Mr. Mussman essentially acknowledged that he owned Dial One USA through Intelcom but stated that there was no affiliation between NITCO and Dial One USA.  At that time, the IURC had certain concerns with respect to a local telephone company's having a long-distance telephone service affiliate.

After reviewing Dial One USA's application, the IURC staff requested further information concerning the allocation of Dial One USA's expenses between it and NITCO.  In September 1989, Dial One USA moved to dismiss its application and did not provide the information the IURC staff requested.  NITCO had paid certain legal and other expenses of Dial One USA and had paid certain legal expenses attendant to the incorporation of Dial One USA's parent, Intelcom.

### H.  Possible Acquisition of Other Local <u>Telephone Companies by NITCO or the Mussman Family</u>

During the years in issue, Mr. Mussman, on several occasions, had asked certain individuals with whom he was

acquainted, including an accountant, an attorney, and a communications consultant, to apprise Mr. Mussman of potential opportunities to acquire other local telephone companies. On the record presented in the instant cases, it is not clear whether Mr. Mussman intended and planned to have NITCO or individual members of the Mussman family ultimately acquire other telephone companies.

In 1990, NITCO contacted two local telephone companies about the possibility of acquiring them. One telephone company replied that it was not for sale; the other company never responded to NITCO's inquiry.

Additionally, in 1990, Rhys visited another local telephone company located in Tennessee to examine its operations and to discuss its possible purchase. Rhys' trip took place after the IRS' commencement of the examinations that resulted in the instant cases.

From 1987 through the time of trial, NITCO did not enter into a contract to purchase another local telephone company.

I. NITCO's Provision of Financial Assistance to
Mr. Mussman's Sons and Various Companies the Sons Owned

Rhys and Northwestern Indiana CATV, Inc.

Prior to 1983, Northwestern Indiana CATV, Inc. (NICATV), a corporation that Rhys owned, applied for and was issued a license by the FCC to offer cable television services in certain areas in

Indiana.  NITCO provided local telephone services in these same areas.  To help Rhys and NICATV obtain the financing needed to build NICATV's cable television system, Mr. Mussman personally guaranteed the bank loan to NICATV.

From 1983 through 1988, NITCO's employees helped construct NICATV's cable television system.  From 1983 through about July 1989, NICATV maintained its offices at the 301 North Washington Street building that it subleased from NITCO.  It further leased or subleased from NITCO a small area of cleared land located behind NITCO's office building at 205 North Washington Street and telephone pole space for cable television attachments.  In 1988 and 1989, NITCO paid a total of at least $6,119.95 and $3,263.51, respectively, in utility bills at the 301 North Washington Street building.

NITCO had no ownership interest in NICATV or in NICATV's cable television facilities.

In 1983, Rhys, NICATV, and NITCO became involved in a dispute before the FCC concerning whether NICATV was an affiliate of NITCO.  The FCC later took the position that NICATV was a NITCO affiliate, in large part because of the extensive financial support and other assistance NICATV and Rhys received from Mr. Mussman and NITCO.  This dispute continued for a number of years and was not resolved until after Rhys sold NICATV to an unrelated party in July 1989.  The FCC proceedings and other related legal proceedings that arose from this dispute are discussed more fully

infra.

The cable television system construction work and other various activities NITCO engaged in, from 1983 to 1989, with respect to NICATV were not undertaken by NITCO with a profit motive. As of about 1989, NITCO's books reflected that Rhys and NICATV owed NITCO in excess of $122,000. In July 1989, Rhys sold NICATV for about $4 million. Although Rhys received sufficient cash from his sale of NICATV to discharge this $122,000 "debt" to NITCO, the "debt" owed to NITCO remained unpaid. On the 1989 annual report it filed with the IURC in May 1990, NITCO indicated that it had written off as uncollectible its $122,000 "receivable" with respect to Rhys and NICATV and stated that this was a "Non-deductible write-off" for tax purposes.

NITCO's 1988 Payment to Rhys and its 1989 Purchase of a Country Club Membership for Rhys

Rhys left NITCO's employ and was no longer an employee of NITCO after December 31, 1983. However, during 1984, NITCO continued to pay Rhys a "salary", provided him with health insurance coverage, and allowed him to participate in NITCO's retirement plan. As a result of the FCC's taking issue with these payments and benefits that NITCO provided to Rhys, on or about May 31, 1985, an attorney representing NITCO advised the FCC that Rhys would no longer serve as a "consultant" to NITCO and indicated that NITCO's provision of such money and benefits to Rhys would cease. As indicated above, the dispute between

NICATV, NITCO, and the FCC continued for some time and was not resolved until after Rhys' July 1989 sale of NICATV. Additionally, in the March 24, 1988, complaint NITCO and Rhys filed in the constitutional challenge action discussed infra, NITCO alleged that Rhys did not receive compensation from NITCO and had no formal responsibilities at NITCO.

On December 20, 1988, NITCO paid $22,646 to Rhys. In early 1989, NITCO purchased individual memberships at a local country club on behalf of several of its employees and on behalf of Rhys. NITCO paid an $1,800 initiation fee to obtain Rhys' club membership. At this point, Rhys had not yet sold NICATV and was not an employee of NITCO.

## Blue Mountain Cellular Telephone, Inc., FiberComm, Inc., and BMCT, L.P.

In 1988, FiberComm, Inc. (FiberComm), a corporation solely owned by Kyle, applied to the FCC for a license to provide cellular telephone services in the rural statistical number three area in Oregon. On October 20, 1989, the FCC issued FiberComm a cellular telephone license to the area. FiberComm previously had obtained a financing commitment from an unrelated party to help it construct its Oregon cellular telephone system. Although FiberComm's cellular telephone system began operating in January 1991, and as of March 31, 1991, FiberComm had 105 subscribers to the system's cellular telephone services, further construction work with respect to the system was needed. In April 1991,

FiberComm assigned its Oregon rural statistical area number three cellular telephone license to Blue Mountain Cellular Telephone, Inc. (BMCT), another corporation solely owned by Kyle.

BMCT was formed in October 1990. In late 1990, BMCT entered into an agreement to purchase for $3,615,771 a cellular telephone license and other assets from WKBN Broadcasting Corp. (WKBN). BMCT and WKBN were unrelated parties. During its negotiations with BMCT, WKBN was advised and represented by a large nationally known law firm.

The above purchase of the cellular telephone license and other assets would allow BMCT to operate a cellular telephone system in the rural statistical number eight area of Washington State. Although WKBN's cellular telephone system for the area began operating in January 1991, and as of March 31, 1991, there were 85 subscribers to the system's cellular telephone services, further extensive construction work with respect to the system was needed.

To help effectuate its purchase of the Washington rural statistical area number eight cellular telephone license and other assets, in late 1990, BMCT applied to a local Indiana bank for a letter of credit for approximately $2.99 million. The bank issued the letter of credit after Mr. Mussman executed an agreement pledging certain of NITCO's assets, including certain certificates of deposit and interests in various governmental securities, to cover the bank's potential liability under the

letter of credit.  In addition, in 1990, NITCO loaned BMCT $500,000 to use as a downpayment on BMCT's purchase of the cellular telephone license and other assets.

On or about April 22, 1991, NITCO loaned BMCT another $3.1 million, so that the principal amount of NITCO's outstanding loans to BMCT totaled in excess of $3.6 million.  With this additional $3.1 million loan from NITCO, BMCT was then able to conclude its purchase of the cable telephone license and other assets from WKBN on April 22, 1991.[3]  As a result, the above letter of credit issued by the local Indiana bank was canceled.

At about the time of its April 22, 1991, acquisition of the Washington rural statistical area number eight cellular telephone business, BMCT arranged to borrow another $2.8 million from an unrelated third party, to finance further construction of the Washington cellular telephone system.  To help BMCT obtain the $2.8 million loan from this third party, NITCO agreed to subordinate its prior loans to BMCT to the third party's loan.

--------

[3]An explanatory note to the Dec. 31, 1991, financial statements of BMCT, L.P., the limited partnership that BMCT, FiberComm, and NITCO subsequently formed, reflects that the $3,615,771 purchase price paid by BMCT was allocated to the license and other assets that were acquired as follows:

| | |
|---|---|
| Land and buildings | $151,143 |
| Cellular license | 2,217,265 |
| Equipment | 147,363 |
| Warranties | 500,000 |
| Consulting agreement | 100,000 |
| Noncompete agreement | 500,000 |
| Total | $3,615,771 |

Thus, the third party generally would enjoy priority over NITCO with respect to having the third party's $2.8 million loan repaid by BMCT.

Kyle ceased being an employee of NITCO around the middle of 1990. He then moved to the Pacific Northwest and resided there in 1991 and 1992 in order to conduct BMCT's and FiberComm's respective operations. In 1991 and 1992, NITCO paid Kyle an annual "salary" of $73,292 and $77,283, respectively. Additionally, from the middle of 1990 through February 1993, Kyle continued to be covered under NITCO's retirement plan and continued to receive coverage under NITCO's dental and health insurance plans.

During 1991 and 1992, BMCT made no interest and principal payments on the loans it received from NITCO.

During the latter part of 1991, Mr. Mussman proposed to Kyle that BMCT, FiberComm, and NITCO form a limited partnership that would undertake to build and operate the Oregon rural statistical area number three and Washington rural statistical area number eight cellular telephone systems. Mr. Mussman told Kyle that he just wanted NITCO to have a short-term investment that paid a guaranteed annual return.

In late 1991, Kyle sold to Rhys: (1) A 46-percent stock interest in BMCT for $61,000, and (2) a 46-percent stock interest in FiberComm for $61,000. By the end of 1991, BMCT owed a total of approximately $3.8 million in principal and interest on the

loan it received from the unrelated third party, in addition to the $3.6 million it owed to NITCO.

By about April 1992, BMCT, FiberComm, and NITCO had formed BMCT, L.P. (the BMCT limited partnership). Although the BMCT limited partnership's formation was actually concluded and finalized by them in April 1992, the BMCT limited partnership's written partnership agreement stated that the partnership agreement was made and entered into by them as of November 30, 1991. The partnership agreement provided that BMCT and FiberComm would serve as the general partners and that NITCO would be a limited partner in the BMCT limited partnership. There were no other partners in the BMCT limited partnership.

BMCT and FiberComm contributed all their assets, subject to all their liabilities, to the BMCT limited partnership. NITCO contributed to the BMCT limited partnership the loans it had previously made to BMCT, interest that had accrued with respect to the loans, and certain equipment.

The formation of the partnership was not an arm's-length transaction among BMCT, FiberComm, and NITCO. The respective partnership interests that BMCT, FiberComm, and NITCO received in the BMCT limited partnership were not commensurate with and bore no reasonable relationship to their relative capital contributions to the BMCT limited partnership. Considering the relative amount of NITCO's capital contribution, NITCO's limited partnership interest was a substantially lesser interest than

what NITCO should have obtained had it been dealing at arm's length with the other two partners, BMCT and FiberComm. In addition, to NITCO's detriment, the partnership agreement greatly overvalued BMCT's and FiberComm's capital contributions to the BMCT limited partnership.

The partnership agreement provided that NITCO would receive annual guaranteed payments from the limited partnership equal to 10 percent of NITCO's capital contribution. The partnership agreement also provided that any remaining cash flow and operating profits would be allocated 99 percent to BMCT and FiberComm, the general partners, and 1 percent to NITCO, the only limited partner. In the event that the BMCT limited partnership was liquidated, the proceeds were to be distributed to the extent of and in proportion to the positive balances in the partners' capital accounts.

Prior to the latter part of 1991, Mr. Mussman and NITCO had not engaged in any discussions with Kyle about the formation of a cellular telephone partnership between BMCT and NITCO. In April 1991, the IRS issued the respective notices of deficiency to petitioners that are the subject of the instant cases. As a result of certain legal advice he and NITCO received from attorneys with the law firm of McDermott, Will & Emery (MW&E), Mr. Mussman decided to have NITCO's loans to BMCT converted to a limited partnership interest in a partnership to be formed among BMCT, FiberComm, and NITCO. A MW&E attorney previously had

represented Mr. Mussman and NITCO during the examinations that led to the IRS' issuances of the notices of deficiency in the instant cases. MW&E attorneys also represented NITCO in the formation of the limited partnership.

Pursuant to their partnership agreement, the partners valued their respective capital contributions to the BMCT limited partnership as follows:

| General Partner | Description | Value |
|---|---|---|
| BMCT | All assets subject to all liabilities | $-0- |
| FiberComm | All assets subject to all liabilities | 6,507,353 |

| Limited Partner | Description | Value |
|---|---|---|
| NITCO | Subordinated promissory note dated Apr. 22, 1991, from BMCT, in the principal amount of $3,615,771, together with interest accrued thereon of $210,920 and the contribution of equipment worth $145,862 | $3,972,553 |

On the BMCT limited partnership's December 31, 1991, financial statements, the partners' formation of the partnership was not treated as being an arm's-length transaction among the partners. Certain notes to the BMCT limited partnership's December 31, 1991, financial statements concerning the relative capital contributions made by BMCT, FiberComm, and NITCO, explained, in pertinent part:

The shareholders of * * * [BMCT] and FiberComm are also related to the majority shareholder of NITCO. Because the partners are all related entities, the assets contributed to the partnership were recorded at book value for financial reporting purposes.

Contributed assets and liabilities at book value are summarized as follows:

|                              | BMCT        | FiberComm  | NITCO       |
|------------------------------|-------------|------------|-------------|
| Cash                         | $(834)      | $25        | $3,615,771  |
| Other current assets         | 402,145     | --         | --          |
| Cellular communica- tions assets | 2,591,958 | 4,075    | --          |
| Licenses & intangibles       | 3,099,068   | 43,331     | --          |
| Current liabilities          | (510,420)   | --         | --          |
| Long-term debt               | (6,382,521) | (12,093)   | 210,920     |
| Net capital contributions    | (800,604)   | 35,338     | 3,826,691   |

* * * * * * *

The limited partner has contributed certain equipment for use by * * * [the BMCT limited partnership], the value of which has not been reflected in the assets or capital accounts. In addition, interest of $210,920 was accrued on the note to the limited partner prior to its conversion to a capital contribution.

On June 9, 1994, shortly before the trial in the instant cases, NITCO's interest in the BMCT limited partnership was redeemed for about $3.6 million.

Although petitioners offered expert witness testimony at trial as to the value of the Oregon rural statistical area number three and Washington rural statistical area number eight cellular telephone businesses, as of March 31, 1991, their experts' appraisal reports grossly inflated the actual value of these cellular telephone businesses. One appraisal report concluded

that FiberComm's Oregon rural statistical area number three cellular telephone business, "free and clear of any encumbrances", was worth $12,039,000, as of March 31, 1991. The other appraisal report concluded that the Washington rural statistical area number eight cellular telephone business, "free and clear of any encumbrances", was worth $8,253,000, as of March 31, 1991.

These inflated valuations were based on revenue projections of the mean annual revenue produced by certain other cellular telephone businesses and were not based on revenue projections of the subject cellular telephone businesses' expected future financial operating results. The appraisal reports failed to elaborate specifically with respect to exactly how comparable these other cellular telephone businesses were to the subject businesses.[4] As indicated above, the subject businesses' cellular telephone systems still required further extensive

--------------------------------------

[4]Each of the appraisal reports stated, in pertinent part:

The subscriber and financial projections presented in this report and used to value * * * [the subject cellular telephone business] are intended to reflect mean expectations in the marketplace. These projections are based on information contained in financial analyses of the industry and the expectations implied by recent comparable sales. These assumptions may differ from projections made for operational purposes. The projections presented in this report therefore include both the current industry results and the significant upside potential of the industry.

construction work.[5]  Moreover, while the Washington cellular telephone business was appraised to be worth in excess of $8.25 million, BMCT, in late 1990, had contracted to purchase this business for approximately $3.6 million following arm's-length negotiations between BMCT and the seller, an unrelated party. See note 3, supra p. 26.  The record does not show that the Washington cellular telephone business appreciated greatly in value shortly after BMCT purchased it in late 1990. Additionally, as indicated above, Kyle sold 46-percent stock interests in BMCT and FiberComm, the two corporations that owned the two businesses, to Rhys for $61,000 apiece in late December 1991.  Kyle testified that the price paid to him by Rhys for the FiberComm shares represented "what a willing buyer would have paid a willing seller".

---

[5]An explanatory note to the Dec. 31, 1991, financial statements of BMCT, L.P., stated, in pertinent part:

> Operations
> BMCT, L.P. is principally engaged in the ownership and operation of cellular telephone systems.  The Company has been in a start-up phase in which its activities have primarily concentrated on the acquisition of cellular licenses and the construction and initial operation of cellular systems.  As a result, the Company has experienced substantial net losses and has had insufficient internally generated funds to cover capital and operating expenditures and debt service. Management anticipates that it will continue to incur substantial losses and will not be able to generate sufficient cash from operations to meet expenditure requirements over the next few years.

## J. Certain Legal Expenses Which NITCO Paid

During the years in issue, NITCO paid substantial fees to various attorneys and law firms in connection with certain legal proceedings and other legal matters.  Most of the legal expenses that are in dispute between the parties are attributable to proceedings that were commenced before the FCC in 1983, concerning whether NICATV (the cable television company Rhys owned) was an affiliate of NITCO or are attributable to subsequent related legal proceedings that were brought as a result of the FCC proceedings.

### Divestiture Action

On October 13, 1983, another cable television company that was a competitor of NICATV filed a complaint with the FCC against Rhys Mussman d/b/a NICATV and NITCO.  The complaint alleged that NICATV and NITCO were affiliated companies engaged in discriminatory and anticompetitive conduct in violation of the Communications Act and the FCC's telephone company/cable television company cross-ownership rules.[6]  In its complaint, the other cable television company sought damages and a cease and

----

[6]The FCC's cross-ownership rules generally prohibited a local telephone company from offering cable television services to the viewing public within its telephone service area, either directly or indirectly through an affiliated company.  The FCC's rules broadly defined affiliation to include any financial or business relationship between the telephone company and the cable television company, except the common carrier-user relationship.

desist order against NICATV and NITCO.

On March 18, 1985, the FCC, after concluding that NICATV and NITCO were affiliated companies and that they had violated the FCC's cross-ownership rules, ordered NICATV and NITCO to: (1) Divest all cable television facilities constructed in violation of the FCC's rules and terminate all improper affiliations between NICATV and NITCO, and (2) undertake to negotiate a good faith settlement of the cable television company-complainant's claim for damages. The FCC further proposed to impose a $20,000 fine against NITCO. On August 13, 1985, the FCC denied NITCO's motion for reconsideration and reaffirmed its prior March 12, 1985, order.

In November 1985, NICATV and NITCO concluded a settlement with the cable television company-complainant that disposed of the complainant's claim against them. The FCC, however, declined to terminate the proceedings and rescind its prior orders requiring NICATV and NITCO to divest themselves of the cable television facilities.

Until about 1990, NITCO and NICATV continued to dispute the validity of the FCC orders requiring a divestiture of the cable television facilities. At various times during the period from August 1985 through 1990, they sought to have the FCC's actions reviewed and invalidated by the United States Court of Appeals for the District of Columbia Circuit and the United States Supreme Court. Ultimately, the Court of Appeals upheld the FCC's

actions, and the Supreme Court denied NITCO and NICATV's petition for a writ of certiorari. See <u>Northwestern Ind. Tel. Co. v. FCC</u>, 872 F.2d 465 (D.C. Cir. 1989), cert. denied 493 U.S. 1035-1036 (1990). These proceedings involving NICATV and NITCO before the FCC, the Court of Appeals for the District of Columbia Circuit, and the Supreme Court, are collectively referred to for convenience as the divestiture action.

Enforcement Action

During 1985 and 1986, after learning that NICATV and NITCO were commencing appellate proceedings to have the FCC's 1985 orders reviewed by the Court of Appeals for the District of Columbia Circuit, the FCC offered to them the option of placing the alleged unlawfully constructed cable television facilities in trust, pending the outcome of the appellate proceedings. NICATV and NITCO, however, were unable to reach an agreement with the FCC concerning such a trust, as the FCC, among other things, proposed that any appreciation in the cable television facilities, during the period that the facilities were held in the trust, be contributed to charity if the FCC's position were sustained. The Court of Appeals for the District of Columbia Circuit subsequently declined NICATV and NITCO's request to have the FCC orders stayed. When NICATV and NITCO further declined to divest themselves of the cable television facilities, the FCC referred the matter to the Department of Justice for purposes of

enforcing the FCC's divestiture orders against NICATV and NITCO.

In early 1987, the United States brought suit against NICATV and NITCO in the United States District Court for the Northern District of Indiana for enforcement of the FCC's divestiture orders. These proceedings before the District Court are referred to for convenience as the enforcement action.

Constitutional Challenge Action

During the course of the above divestiture action, NICATV and NITCO later tried to raise certain issues with respect to the constitutionality of the Communications Act and the FCC's cross-ownership rules. The FCC and the Court of Appeals for the District of Columbia Circuit, however, essentially held that these constitutional issues were not properly before them. Northwestern Ind. Tel. Co. v. FCC, 872 F.2d at 471-472.

On March 24, 1988, Rhys and NITCO filed a declaratory judgment action against the FCC in the United States District Court for the Northern District of Indiana, requesting that the District Court declare unconstitutional an FCC cross-ownership rule imposed against Rhys. In the complaint, it was alleged that Rhys wished to buy shares of stock in NITCO from Mr. Mussman, but was unable to do so under the FCC's cross-ownership rules, in light of his ownership of NICATV. These proceedings before the District Court are referred to for convenience as the constitutional challenge action.

Attribution of Legal Expenses NITCO Incurred and/or Paid to
Various Legal Proceedings and Other Legal Matters

During 1987 and 1988, the attorney's fees in issue, that
NITCO incurred and/or paid to the law firm of Baker & Hostetler
(B&H), were attributable to the following legal proceedings and
other legal matters:

| Year | Amount | Proceeding or Matter |
|------|--------|----------------------|
| 1987 | $2,762.65 | AT&T negotiations |
|      | 1,500.00 | Constitutional challenge action |
|      | 4,337.50 | Dial One Mobile |
|      | 130.00 | Divestiture action |
|      | 172,756.85 | Enforcement action |
|      | 1,000.00 | NITCO business plan |
| 1988 | 2,500.00 | AT&T negotiations |
|      | 15,959.48 | Constitutional challenge and divestiture action |
|      | 3,022.96 | Dial One Mobile |
|      | 7,009.89 | RSA #1 |
| 1989 | 10,117.80 | Postal Service Investigation |
|      | 1,365.44 | Unknown |

Respondent concedes that the above fees paid to B&H for AT&T
negotiations and the NITCO business plan are deductible by NITCO.
The Dial One Mobile matters concerned the company that Rhys
owned, which was engaged in activities with respect to cellular
telephone systems in Asheville, North Carolina, and Enid,
Oklahoma.  NITCO had no interest in Dial One Mobile.  The Postal
Service investigation involved a matter in which certain
documents and records of NICATV's were seized from NICATV's
business offices.

During 1987, 1988, and 1989, the attorney's fees in issue, that NITCO incurred and/or paid to the law firm of LMN&G, were attributable to the following legal proceedings and other legal matters:

| Year | Amount | Proceeding or Matter |
|------|--------|----------------------|
| 1987 | $169,686.00 | Constitutional challenge, divestiture, and enforcement actions |
|      | 5,000.00 | Unknown |
| 1988 | 98,212.00 | Constitutional challenge, divestiture, and enforcement actions |
|      | 1,000.00 | Dial One USA trademark |
|      | 38,020.00 | RSA #1 |
|      | 1,400.00 | Unknown |
| 1989 | 214,201.00 | Constitutional challenge, divestiture, and enforcement actions |
|      | 5,393.00 | Dial One USA |
|      | 31,249.00 | RSA #1 |
|      | 32,240.00 | Sprint contract |
|      | 14,650.00 | Unknown |

The Sprint work referred to above concerned the negotiation of a contract between Dial One USA and Sprint.

During 1988 and 1989, NITCO incurred and/or paid to the law firm of Williams & Connolly (W&C) attorney's fees that were attributable to the following legal proceedings and other legal matters:

| Year | Amount | Proceeding or Matter |
|------|--------|----------------------|
| 1988 | $32,144.50 | Constitutional challenge action |

| 1989 | 13,742.45 | Constitutional challenge action |
| | 2,239.85 | Dial One Mobile |

The Dial One Mobile work listed above was billed by W&C to Rhys, not to NITCO. Petitioners concede that the $2,239.85 is not deductible by NITCO and represents constructive dividend income to Mr. Mussman.

During 1989, NITCO made certain legal expenditures totaling $88,484, for which it claimed no deduction. A portion of these expenditures in the amount of $75,342 was recorded by NITCO in an account called "Cellular Telephone Investment". The remaining $13,052 of the expenditures was recorded by NITCO in an account called "Other Investments". The $88,484 in legal expenditures was attributable to the following matters:

| Payee | Amount | Matter |
|-------|--------|--------|
| Andrew & Kurth | $1,166.59 | Dial One Mobile |
| B&H | 32,363.64 | Dial One Mobile |
| EMCI | 3,327.50 | Purchase of cellular telephone publications |
| Handlon & Handlon | 1,525.81 | Work for Dial One USA and Intelcom |
| | 132.00 | Work for FiberComm |
| | 229.00 | Unknown |
| | 234.00 | Incorporation of Northwestern Indiana Cellular |
| LMN&G | 2,982.58 | Work for Rhys |
| | 2,564.05 | Indiana RSA #1 venture |
| | 4,400.00 | Conceded by petitioners to be constructive dividend to Mr. Mussman |
| Unknown | 39,968.83 | Unknown |

On the record presented in the instant cases, it is not clear

whether the purchase of cellular publications referred to above furthered NITCO's interests and was of direct and substantial benefit to NITCO or, instead, was primarily of benefit to individual members of the Mussman family. The Northwestern Indiana Cellular matter referred to above concerned a corporation that was originally formed to hold cellular telephone interests, but which subsequently was abandoned. It is not clear whether Mr. Mussman planned to have NITCO, rather than the individual members of the Mussman family, own Northwestern Indiana Cellular, and whether Mr. Mussman planned to have it hold cellular telephone interests that NITCO, rather than individual members of the Mussman family, owned.

K.  NITCO's Earnings and Dividend Payment History,
Current Liquid Assets, Working Capital Needs, and Records
Documenting Its Specific Future Business Needs and Plans

NITCO maintained its books and filed its income tax returns on a calendar year basis, utilizing an accrual method of accounting. During 1982 through 1993, NITCO's gross receipts and its accumulated earnings and profits (Accum. E&P) were as follows:

| Year | Gross Receipts | Accum. E&P | Yearly Increase In Accum. E&P |
|------|----------------|------------|-------------------------------|
| 1982 | $3,172,182 | $3,176,521 | -- |
| 1983 | 3,684,425 | 3,929,694 | $753,173 |
| 1984 | 4,247,606 | 4,895,862 | 966,168 |
| 1985 | 4,019,355 | 5,406,973 | 511,111 |
| 1986 | 4,575,760 | 6,240,031 | 833,058 |
| 1987 | 5,754,822 | 7,807,835 | 1,567,804 |
| 1988 | 6,134,837 | 9,226,900 | 1,419,065 |

| 1989 | 5,281,159 | 9,939,632 | 712,732 |
| 1990 | 6,305,070 | 11,675,809 | 1,736,177 |
| 1991 | 6,860,118 | 12,688,043 | 1,012,234 |
| 1992 | 7,780,380 | 14,544,105 | 1,856,062 |
| 1993 | 8,726,683 | 15,250,005 | 705,900 |

During 1987 through 1989, NITCO's current assets consisted mostly of cash or other liquid assets.  Its customer accounts receivable and National Exchange Carriers Association accounts receivable (i.e., long-distance call access charges) were billed monthly.

During 1987 through 1989, NITCO's net current liquid assets, as adjusted by two loans it made, respectively, to a local Indiana bank's employee stock option plan and to the bank's president,[7] and if not depleted by certain payments it made to support the individual Mussman family members during these years, would have been as follows:

| Year | Net Current Liquid Assets |
|------|---------------------------|
| 1987 | $5,183,131 |
| 1988 | 4,726,973 |
| 1989 | 4,455,217 |

NITCO's working capital requirements for 1987, 1988, and 1989, were $75,569, $278,646, and $190,312, respectively.

---

[7]After its renegotiation in August 1987, the ESOP loan essentially was required to be repaid to NITCO on NITCO's demand. The $400,000 loan to the bank president occurred on June 15, 1987, and was made out of a loan repayment NITCO received from the ESOP.  Although a promissory note bearing a December 1988 execution date was later issued by the bank president, the note obligated the bank president to repay the $400,000 loan to Mr. Mussman, rather than to NITCO, in 4 years.

From 1980 through 1989, NITCO maintained no written records documenting its specific future business needs and plans.

From 1954 through 1994, NITCO did not declare and pay any formal dividends to its shareholders.

L.  Examinations Conducted of Petitioners' Returns, Notices of Deficiency, NITCO's Petition, and Subsequent Formal Discovery Conducted by Respondent in the Instant Cases

On or about August 3, 1990, a revenue agent contacted and apprised Mr. Mussman and NITCO that the agent would be conducting an examination.  In an Information Document Request dated October 31, 1990, to NITCO, the revenue agent, among other things, asked NITCO to elaborate with respect to its plans concerning the use of its accumulated earnings.  The agent's request, in pertinent part, stated:

> 1. During my first visit, you enumerated the following potential uses of the company's retained earnings:
>
> At the present time, the Company is involved in expansion:
>
> (1) The Company has a plan to introduce fiberoptics to its system.  Engineering estimates have not been made for the system.
>
> (2) The Company is developing a cellular telephone capability for the area.  This area is a RSA, Rural Statistical Area.  This development is being shared with two other companies, Monan and Pulaski-White. However, the family members, not the Company, made the investment.
>
> (3) The Company would like to acquire the Monan telephone exchange.  There have been negotiations but nothing has been put in writing about this.  The Company is closely held.  As a result, there are no

formal annual meetings or minutes.

Are there any other planned uses of these funds?

On or about December 12, 1990, two MW&E attorneys advised the revenue agent that they would be representing NITCO during the examination. By letter dated December 17, 1990, one of the MW&E attorneys further advised the revenue agent, among other things: (1) NITCO had not yet completed its review of the planned uses for its accumulated earnings, and (2) NITCO was not willing to consent to an extension of the period of limitations on assessment and collection of its tax liability with respect to 1987. The MW&E attorney's December 17, 1990, letter, in pertinent part, stated:

> You have also asked the company to identify the potential uses of net liquid assets [and accumulated earnings]. We have recently been retained by the company for purposes of this representation and are in the process of reviewing the corporate documentation and interviewing the officers. When that process has been completed, we will provide you with a full statement concerning the historic purposes for accumulating net liquid assets [and earnings]. Although the process is far from complete, the list included in your [October 31, 1990] document request overlooks the largest and most obvious need for net liquid assets. That is, the preservation of financial strength to cope with the uncertainty present in the telecommunications industry during the period under audit. Those uncertainties concern technical developments and regulatory governance and management succession.

> As counsel to the company, we have advised them not to extend the statute of limitation for the year 1987 for purposes of audit. While we generally recommend extensions of the statute for purposes of appellate review of a case, we do not recommend

extension of the statute for purposes of audit. In our view, the time pressure you face for the year 1987 is the product of your (or your supervisor's) decision to open 1987 with so little time remaining on the statute.

Respondent subsequently notified NITCO of the proposed determination against NITCO with respect to accumulated earnings tax liability for 1987, 1988, and 1989. NITCO chose not to respond and did not file a statement concerning the grounds on which it relied to establish that its earnings were accumulated to meet its reasonable business needs.[8]

In April 1991, respondent issued respective notices of deficiency to Mr. and Mrs. Mussman for 1988 and 1989, and to NITCO for 1987, 1988, and 1989. With respect to the accumulated earnings tax liability asserted against NITCO, the notice of deficiency issued to NITCO stated, in pertinent part:

> 10(b.) Section 531 Tax
> It is determined that you were availed of for the purpose of avoiding the income tax with respect to your shareholders by permitting earnings and profits to accumulate instead of being divided or distributed during the taxable years 1987, 1988, and 1989. Accordingly, the accumulated earnings tax provided by Section 531 of the Internal Revenue Code is being asserted for 1987, 1988, and 1989. In determining your accumulated earnings credit under the provisions of section 535 of the Internal Revenue Code, your failure or refusal to respond to the notification sent to you by certified mail on January 15, 1991 pursuant to [section] 534(b) explaining the capital needs of your business has been considered. Therefore, accumulated

---

[8]As a result, in the instant cases, NITCO has the burden of proof in establishing that it is not liable for the accumulated earnings tax liabilities determined against it by respondent in the notice of deficiency. See sec. 534(a)(2).

earnings tax is increased $540,044.00, $322,147.00, and $195,917.00, respectively for the tax years ended December 31, 1987, December 31, 1988, and December 31, 1989.  * * *

The notice of deficiency indicated that respondent computed NITCO's above 1987, 1988, and 1989 accumulated earnings tax liabilities as follows:

|  | 1987 | 1988 | 1989 |
|---|---|---|---|
| Taxable income as adjusted | $1,431,283.00 | $1,150,524.00 | $699,703.00 |
| Less dividends | 0.00 | 0.00 | 0.00 |
| Current earning and profits retained | 1,431,283.00 | 1,150,524.00 | 699,703.00 |
| Accumulated earnings Credit | | | |
| 1. Minimum accumulated earnings allowed | 250,000.00 | -- | 250,000.00 |
| 2. Less accumulated earnings as of the close of the preceding taxable year | (6,240,031.45) | (7,800,101.00) | (9,266,900.00) |
| 3. Reduced by dividends considered paid during preceding taxable year | 0.00 | 0.00 | 0.00 |
| 4. Allowable credit | 0.00 | 0.00 | 0.00 |
| 5. Current earnings and profits determined to be retained for reasonable needs of the business | 0.00 | 0.00 | 0.00 |
| 6. Less: deduction for long-term capital gains | 0.00 | -- | -- |
| 7. Allowable credit under IRC sec. 535(c)(1) | 0.00 | 0.00 | 0.00 |
| Accumulated earnings credit (greater of item 4 or item 7) | 0.00 | 0.00 | 0.00 |
| Accumulated taxable income subject to tax | $1,431,283.00 | $1,150,524.00 | $699,703.00 |
| Tax on accumulated earnings | 540,044.00 | 322,147.00 | 195,916.84 |

Petitioners subsequently filed their respective petitions commencing the instant cases. In its petition, NITCO did not allege any specific business needs for which it was accumulating its earnings.

During pretrial discovery, on March 4, 1992, respondent propounded certain interrogatories to NITCO asking it to elaborate fully with respect to the alleged specific business needs for which NITCO contended it was accumulating its earnings during 1987 through 1989. In its April 17, 1992, response to the interrogatories, NITCO generally objected to having to answer the interrogatories and declined to provide the information respondent sought, except that in partial response to some of the interrogatories, NITCO referred to an April 8, 1992, memorandum concerning NITCO's reasonable business needs that had been prepared by NITCO's counsel and that recently had been furnished by NITCO's counsel to respondent's Appeals officer. The April 8, 1992, memorandum provided to the Appeals officer stated:

> This is a summary of the items we intend to rely on as justification of * * * NITCO's accumulation of working capital [and earnings] for years 1987 through 1989. It is based upon documents we have reviewed and discussions we have had to date with NITCO personnel and outside advisors (including NITCO's accountant, outside counsels [sic] and independent telephone industry consultants).

The memorandum did not indicate that NITCO, during the years in issue, planned to: (1) Replace its Alcatel switches, (2) acquire

SS7 signaling technology,[9] (3) offer CLASS services,[10] (4) save in order to provide increased local telephone services in the event the proposed Indiana airport was built in or near NITCO's service area, (5) save for expansion of NITCO's principal office facilities, or (6) purchase a computer to meet its alleged office equipment needs.  Subsequently, on August 4, 1992, the Court granted respondent's motion to compel NITCO to answer the interrogatories and issued an order requiring NITCO to answer the interrogatories on or before September 4, 1992.

It was not until about December 1992 that NITCO first advised respondent of its alleged plans, during the years in issue, to:  (1) Save in order to provide increased telephone services in the event the proposed Indiana airport was built, and (2) save for an expansion of its principal office facilities. Similarly, it was not until November 1993 that NITCO first advised respondent that its alleged office equipment needs during the years in issue included a billing and collections computer.

---

[9]SS7 signaling technology uses a data network separate from the voice network to carry information about telephone call setup and accounting.

[10]CLASS services are a group of telecommunication services consisting of selective call forwarding, selective call rejection, distinctive ringing, customer originated trace, automatic callback, automatic recall, and calling number delivery and calling number delivery blocking.

OPINION

Petitioners bear the burden of proof and must establish that the determinations made in respondent's notices of deficiency are erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

## I.  Accumulated Earnings Tax

Section 532(a) provides that every corporation formed or availed of for purposes of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed, shall be subject to the accumulated earnings tax imposed by section 531. The accumulated earnings tax is a way of discouraging corporations from accumulating earnings not needed in conducting the business.  Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 268 (1986).  The tax is considered to be a penalty and, therefore, is to be strictly construed.  Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975); see generally Technalysis Corp. v. Commissioner, 101 T.C. 397, 402-403 (1993).

The most important factor in deciding if the accumulated earnings tax applies is whether a corporation accumulates earnings and profits beyond the reasonable needs of the business. United States v. Donruss Co., 393 U.S. 297, 307 (1969).  Section 533(a) establishes a presumption that a corporation that permits earnings and profits to accumulate beyond the reasonable needs of

the business does so with the purpose of avoiding income tax with respect to its shareholders.

The presumption can be rebutted by a preponderance of evidence to the contrary. Sec. 533(a); Snow Manufacturing Co. v. Commissioner, supra at 269. Therefore, the accumulated earnings tax does not apply if a corporation has allowed an unreasonable accumulation but lacks the proscribed purpose or intent. Technalysis Corp. v. Commissioner, supra at 403; Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153, 173 (1957), affd. 251 F.2d 278 (7th Cir. 1958). However, it has been recognized that without the presumption provided in section 533(a), the accumulated earnings tax would largely, as a practical matter, be unenforceable. Ivan Allen Co. v. United States, supra at 628.

Section 1.533-1(a)(2), Income Tax Regs., sets forth factors to be considered in determining whether a corporation had the proscribed purpose. Some of the relevant factors are: (1) Dealings between the corporation and its shareholders for the personal benefit of the shareholders; for example, personal loans; (2) corporate investment of undistributed assets in unrelated businesses or investments; and (3) the corporation's dividend history.

Section 535(a) defines "accumulated taxable income" (the recomputed taxable income of the corporation against which tax under section 531 is imposed) as the taxable income of the corporation, as adjusted in section 535(b), less the dividend-

paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in section 535(c)). Insofar as relevant to the instant cases, this accumulated earnings credit is the amount of the corporation's earnings and profits that are retained for the reasonable needs of the business. Where a taxpayer can show that all its current earnings were accumulated for the reasonable needs of the business, there is no accumulated earnings tax since the accumulated earnings credit eliminates the amount against which the tax is imposed. E.g., Magic Mart, Inc. v. Commissioner, 51 T.C. 775, 799 (1969); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 336 (1968); John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 474 (1965).

Whether a taxpayer's accumulation of earnings and profits is in excess of its reasonable business needs is a factual question. Helvering v. National Grocery Co., 304 U.S. 282 (1938). The "reasonable needs of the business" includes the reasonably anticipated needs of the business. Sec. 537(a)(1); sec. 1.537-1(a), Income Tax Regs.

With respect to a corporation's reasonably anticipated future business needs, section 1.537-1(b), Income Tax Regs, provides:

> (b) Reasonably anticipated needs. (1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible

plans for the use of such accumulation.  Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business.  Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year.  Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are present at the close of such taxable year.  However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated.  * * *

Upon determining the amount necessary to satisfy the "reasonable needs of the business", we shall not simply compare this amount with the corporation's total accumulated earnings and profits, but shall examine the amount of accumulated earnings and profits that is reflected in business-related assets or in idle net liquid assets of the corporation.  Ivan Allen Co. v. United States, supra at 628; Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495, 501 (4th Cir. 1960), affg. T.C. Memo. 1958-221.  In other words, we must consider whether the corporation's accumulated earnings and profits have been translated into assets related to the business, so as to have been employed to meet the

corporation's reasonable business needs.  In <u>Smoot Sand & Gravel

Corp. v. Commissioner</u>, 274 F.2d at 500-501, the Court of Appeals

for the Fourth Circuit explained:

> the size of the accumulated earnings and profits or
> surplus is not the crucial factor; rather, it is the
> reasonableness and nature of the surplus.  * * *
> Again, to the extent the surplus has been translated
> into plant expansion, increased receivables, enlarged
> inventories, or other assets related to its business,
> the corporation may accumulate surplus with impunity.
> * * *

In <u>Ivan Allen Co. v. United States</u>, <u>supra</u>, the taxpayer had

substantial accumulated earnings and profits and owned certain

readily marketable securities that had considerably appreciated

in value.  The issue presented to the Supreme Court was whether

in determining the applicability of the rebuttable presumption

provided in section 533(a) (i.e., whether the taxpayer's earnings

had accumulated beyond the reasonable needs of the business so

that the taxpayer should be presumed to have the purpose to avoid

income with respect its shareholders), the taxpayer's securities

were to be taken into account at their cost to the corporation or

at their net liquidation value.  <u>Id.</u> at 619.

In holding that the securities were to be taken into account

at their net liquidation value, rather than cost, the Supreme

Court recognized that a comparison of the taxpayer's liquidity to

its business needs was highly significant in deciding the

reasonableness of the taxpayer's accumulation of earnings.  It

explained:

It is important to emphasize that we are concerned here with a tax on "accumulated taxable income," § 531, and that the tax attaches only when a corporation has permitted "earnings and profits to accumulate instead of being divided or distributed," § 532(a).  What is essential is that there be "income" and "earnings and profits."  This at once eliminates, from the measure of the tax itself, any unrealized appreciation in the value of the taxpayer's portfolio securities over cost, for any such unrealized appreciation does not enter into the computation of the corporation's "income" and "earnings and profits."

The corporation's readily marketable portfolio securities and their unrealized appreciation, nonetheless, are of profound importance in making the entirely discrete determination whether the corporation has permitted, what, concededly, are earnings and profits to accumulate beyond its reasonable business needs.  If the securities, as here, are readily available as liquid assets, then the recognized earnings and profits that have been accumulated may well have been unnecessarily accumulated, so far as the reasonable needs of the business are concerned.  * * * Upon this analysis, not only is such accumulation as has taken place important, but the liquidity otherwise available to the corporation is highly significant.  In any event--and we repeat--the tax is directed at the accumulated taxable income and at earnings and profits.  The tax itself is not directed at the unrealized appreciation of the liquid assets in the securities portfolio.  The latter becomes important only in measuring reasonableness of accumulation of the earnings and profits that otherwise independently exist.  What we look at, then, in order to determine its reasonableness or unreasonableness, in the light of the needs of the business, is any failure on the part of the corporation to distribute the earnings and profits it has.

Ivan Allen Co. v. United States, 422 U.S. at 627-628.

What is required, then, is a comparison of accumulated earnings and profits with "the reasonable needs of the business."  Business needs are critical.  And need,

plainly, to use mathematical terminology, is a function of a corporation's liquidity, that is, the amount of idle current assets at its disposal. The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business. * * *

The taxpayer itself recognizes, and accepts, the liquidity concept as a basic factor, for it "has agreed that the full amount of its realized earnings invested in its liquid assets--their cost--should be taken into account in determining the applicability of Section 533(a)." * * * It concedes that if this were not so, "the tax could be avoided by any form of investment of earnings and profits." * * * But the taxpayer would stop at the point of cost and, when it does so, is compelled to compare earnings and profits--not the amount of readily available liquid assets, net--with reasonable business needs.

We disagree with the taxpayer and conclude that cost is not the stopping point; that the application of the accumulated earnings tax, in a given case, may well depend on whether the corporation has available readily marketable portfolio securities; and that the proper measure of those securities, for purposes of the tax, is their net realizable value. Cost of the marketable securities on the assets side of the corporation's balance sheet would appear to be largely an irrelevant gauge of the taxpayer's true financial condition. Certainly, a lender would not evaluate a potential borrower's marketable securities at cost. Realistic financial condition is the focus of the lender's inquiry. It also must be the focus of the Commissioner's inquiry in determining the applicability of the accumulated earnings tax.

This taxpayer's securities, being liquid and readily marketable, clearly were available for the business needs of the corporation, and their fair market value, net, was such that, according to the stipulation, the taxpayer's undistributed earnings and profits for the two fiscal years in question were permitted to accumulate beyond the reasonable and reasonably anticipated needs of the business.

Ivan Allen Co. v. United States, 422 U.S. at 629-630 (fn. refs. omitted.)

NITCO's Net Liquid Assets

Petitioners contend that NITCO's accumulated earnings and profits are "irrelevant" and that only NITCO's net liquid assets should be considered in connection with NITCO's reasonable business needs and its liability for accumulated earnings tax during the years in issue. They argue that the accumulated earnings tax is directed at "economic reality" and that this relevant economic reality (NITCO's dividend-paying capacity) is to be determined solely by examining NITCO's available net liquid assets.

Respondent, on the other hand, asserts that NITCO's true dividend-paying capacity is not accurately reflected by NITCO's remaining net liquid assets, because of NITCO's substantial expenditures, during 1987 through 1989, for the personal benefit of Mr. Mussman's family. We agree with respondent.

We have no quarrel with, and the case law completely supports, the proposition that where a corporation's net liquid assets have been invested in nonliquid, business-related assets, the corporation has appropriately diminished its dividend-paying capacity for accumulated earnings tax purposes. In such instances, the corporation's accumulated earnings have been applied to meet its reasonable business needs. However, this is not the same situation that we are presented with in the instant cases.

In our findings, we have made certain adjustments to reflect what NITCO's net liquid assets would have been (i.e., its true dividend-paying capacity), during the years in issue, if NITCO had not made certain nonbusiness-related payments to benefit the individual Mussman family members.[11]  These expenditures did not further NITCO's business interests and were not of substantial and direct benefit to NITCO.

Petitioners' arguments in this connection misapply and misinterpret the pertinent case law.  NITCO's remaining net liquid assets do not reflect its true dividend-paying capacity because of substantial nonbusiness-related expenditures it made. Indeed, many of these expenditures may have been constructive dividends to Mr. Mussman.  These expenditures do not represent translations of NITCO's accumulated earnings into assets related to the conduct of NITCO's business.  Cf. Smoot Sand & Gravel

---

[11]Petitioners, on the other hand, contend that for 1987, 1988, and 1989, NITCO's net liquid assets were as follows:

| Year | Net Liquid Assets |
|------|-------------------|
| 1987 | $3,190,325 |
| 1988 | 4,251,470 |
| 1989 | 3,991,669 |

We note that even these respective amounts of net liquid assets well exceed the current earnings that NITCO accumulated during each of these years.  We are further aware that to the extent we sustain respondent's determinations with respect to the Mussmans' having constructive dividend income for the years in issue, there will be a resulting decrease in NITCO's accumulated taxable income and current earnings.  See secs. 535(a), (c)(1); 301(c)(1); 316(a).

Corp. v. Commissioner, 274 F.2d at 501.  In other words, rather than being positive evidence demonstrating that NITCO's earnings were, in fact, accumulated to meet its reasonable business needs, these expenditures indicate NITCO's earnings were accumulated for the proscribed purpose of avoiding income tax with respect to its shareholders.  See sec. 1.533-1(a)(2), Income Tax Regs.  To accept petitioners' contention would be tantamount to holding that the accumulated earnings tax could be avoided by making nonbusiness expenditures to benefit a shareholder or shareholder's family.

## NITCO's Reasonable Business Needs

The parties have stipulated, and we have so found, what NITCO's working capital requirements were during the years in issue.  In addition to these working capital requirements, petitioners contend that a number of other reasonably anticipated business needs of NITCO justified NITCO's accumulation of earnings during the years in issue.[12]

---

[12]Petitioners contend that NITCO's "reasonably anticipated business needs" during the years in issue were as follows:

| Business Need | 1987 | 1988 | 1989 |
|---|---|---|---|
| Working capital | $75,569 | $278,646 | $190,312 |
| Retirement of long-term debt | 557,505 | 170,760 | -0- |
| Plant modernization: | | | |
| Fiber to the exchange | 1,000,000 | same | same |

(continued...)

Respondent generally disputes that NITCO, during 1987 through 1989, had the reasonable business needs that petitioners allege. Respondent agrees with the working capital requirements and agrees that, for 1987, NITCO needed $669,530 to retire its long-term debt on the old switching equipment it replaced. Respondent further agrees that NITCO's reasonable business needs required the accumulation of some earnings to install fiber optic cable between its exchanges, but contends that petitioners have failed to offer convincing evidence establishing the precise amount. Respondent contends that NITCO, during the years in issue, had no actual definite plans with respect to meeting the other alleged business needs and that those alleged needs were not reasonably anticipated business needs of NITCO. We generally agree with respondent.

---

[12](...continued)

| | | | |
|---|---|---|---|
| Fiber optic cable to support broadband | 500,000 1,000,000 | same same | same same |
| Switches for SS7/Class | 6,000,000– 10,000,000 | same | same |
| Broadband switch | 8,000,000– 20,000,000 | same | same |
| Telephone acquisition | 1,000,000– 5,000,000 | same | same |
| Airport risk: | | | |
| In NITCO's exchange | 300,000,000 | same | same |
| Near NITCO's exchanges | 25,000,000– 50,000,000 | same | same |
| Cellular diversification | 2,000,000– 2,500,000 | same | same |
| Billings & collections computer | 850,000– 1,000,000 | same | same |
| Building expansion; furnished | 2,000,000– 2,500,000 | same | same |

In evaluating what NITCO's reasonable business needs were during the years in issue, we have been faced with a lack of forthrightness on petitioners' part. For instance, Mr. Mussman testified that, during 1987 through 1989, NITCO planned to replace its Alcatel switches, because the French manufacturer had decided to abandon the U.S. market and stop conducting future research and development efforts with respect to upgrading the switches. He claimed that NITCO learned of the French manufacturer's decision shortly after NITCO had purchased and installed its Alcatel switches. Yet, when questioned by respondent's counsel on cross-examination about NITCO's contrary representations concerning the switches to the IURC's engineering staff in late 1990, Mr. Mussman maintained that the statements in the August 1990 letter issued to NITCO by Alcatel's U.S. representative were untrue. Mr. Mussman, however, offered no convincing explanation why, if NITCO knew the statements made were untrue, NITCO then had provided a copy of the letter to the IURC's staff.[13]

On the record presented, it is questionable whether during

---

[13]In another instance, Mr. Mussman testified that architectural plans of new principal office facilities for NITCO were drawn up in 1989. On cross-examination, however, he claimed that the plans were not provided to respondent during pretrial discovery, because the plans were his personal property and did not belong to NITCO. He further offered no convincing explanation with respect to why petitioners had failed to produce the alleged plans and information concerning the alleged architect who drew them in response to respondent's pretrial discovery requests.

the years in issue, NITCO had actual plans concerning many of the purported business needs petitioners have alleged.  NITCO produced practically nothing in terms of documents that were prepared during the years in issue that reflect its alleged plans and future needs.  Indeed, we view these claimed future needs to be largely afterthoughts advanced by petitioners to avoid the imposition of accumulated earnings tax liability against NITCO. Moreover, almost all the asserted future needs are too vague and uncertain to be considered reasonably anticipated business needs of NITCO.

Additionally, considerably undercutting petitioners' position that NITCO's earnings were accumulated to meet these alleged reasonably anticipated business needs of NITCO, is the fact that, notwithstanding these alleged future needs, NITCO, in late 1990 and early 1991, loaned approximately $3.6 million to BMCT, a corporation solely owned by Mr. Mussman's son Kyle, to enable BMCT to acquire a Washington State cellular telephone business.  The $3.6 million loaned was an investment unrelated to NITCO's business and was of dubious economic benefit to NITCO, considering NITCO's later agreement to subordinate its rights with respect to BMCT's repayment of the loan in order for BMCT to borrow an additional $2.8 million from another lender.  Although NITCO subsequently converted its $3.6 million loan to a limited partnership interest in the BMCT limited partnership, pursuant to the advice of its attorneys following the issuances of the

notices of deficiency in the instant cases, the limited partnership's formation was not an arm's-length transaction between the partners, and the limited partnership interest NITCO obtained was not commensurate with its relative capital contribution to the limited partnership.

With respect to the retirement of NITCO's long-term debt, petitioners have established that in 1988 and 1989, NITCO made respective payments of $575,505 and $170,700 to retire the debt. Although the debt's outstanding principal amount was $669,530, NITCO was required to pay some additional interest and a prepayment penalty to retire the debt.

With respect to NITCO's installation of fiber optic cable to connect its exchanges, Mr. Mussman testified that NITCO spent about $1 million to install the fiber optic cable during 1987 through 1989. On cross-examination, however, he admitted that his $1 million figure included NITCO's overhead costs, as NITCO's employees performed the installation work. Further, most of the cable to connect the exchanges was installed in 1987 and 1988. By 1989, NITCO was in the final stages of the connection work, and only a relatively short segment of cable remained to be installed once NITCO resolved an easement problem. We think Mr. Mussman's $1 million figure is high. Petitioners offered no specific additional evidence concerning the actual amounts NITCO spent to install the fiber optic cable during 1987 through 1989. Doing the best we can on the record presented, and bearing

heavily against petitioners because this inexactitude is of their own making, we estimate that the accumulation of earnings justified to meet NITCO's reasonable business need for installing fiber optic cable to connect its exchanges was $300,000 for 1987 and was $100,000 for each of the years 1988 and 1989.

With respect to broadband switches and the fiber optic cable to support broadband switches, petitioners maintain that NITCO planned to eventually acquire the broadband switches at about the time it commenced to rewire the homes of its residential customers with fiber optic cable.[14]  Yet, in the white paper Kyle

-----

[14]In a letter dated Sept. 28, 1992, to respondent's counsel that elaborated on certain of NITCO's alleged business needs, petitioners' counsel stated:

> During the years in issue * * * [NITCO] also determined that ultimately it would be required to retrowire individual housing for fiber optic cable and to move on to the next generation of digital switching. Fiber optic cable coupled with the next generation of digital switching will allow NITCO to provide service option features to its customers comparable to adjoining telephone companies such as Call blocking, caller I.D., and call-me-back services.  This next generation of digital switches is generally described as broad-band switches which have the capacity for greater programming flexibility in order to provide multiple services to each line.  While no copper wire in existing residential and commercial installation has been retrofitted with fiber optic cable to date to allow use of the new generation switches, such program is anticipated in the near future to enable NITCO to remain competitive.

These broadband switches apparently could also be used to provide television or video services to customers.  On reply
(continued...)

authored and published in 1989 while he was NITCO's general manager, Kyle was of the view that the installation of fiber optic cable in residences by local telephone companies was not then economically feasible. His paper estimated that using fiber optic cables to provide "plain old telephone service" to individual homes, at that time, would cost from $4,000 to $10,000 per residential customer.

Respondent offered the expert witness report of Dr. Charles L. Jackson and Dr. Jeffrey H. Rohlfs, each of whom has had extensive experience in the telecommunications industry. Dr. Jackson is an engineer with 25 years of experience in the computer and telecommunications industry. He has worked as a consultant for the past 13 years. Dr. Rohlfs is an economist with over 20 years experience in the telecommunications industry. He worked for 14 years at Bell Labs where he became a department head for economic modeling research and subsequently has worked for the last 10 years as a consultant.

Drs. Jackson and Rohlfs were of the opinion that, as of 1989, vast uncertainty existed about the future cost and availability of systems that would provide fiber connections to

---

[14](...continued)
brief, petitioners state that they are not contending that "NITCO * * * sought to provide wideband (video) services in 1987 to 1989, only that it saw a need * * * to provide video services in the mid to late 1990s to meet the threat of competition from cable companies."

residential customers.[15]  They further opined that it would be a number of years before it was economically justifiable for NITCO even to consider seriously investing in the technology to provide broadband switch services over fiber lines to its business and residential customers.  They noted that during 1987 through 1989, NITCO had few, if any, business customers who would demand such services.

Petitioners offered the expert witness opinion of Warren A. Liss.  Mr. Liss has extensive experience in the telecommunications industry.  He has held a variety of management positions involving the design and development of telephone switching hardware and software, telephone networks, and telecommunications services.  He worked for over 20 years at Bell Labs and then was employed as a director of advanced systems engineering at MCI Telecommunications.  Since 1987, he has worked as a consultant to various local, long distance, and international telephone service companies.

Mr. Liss was of the opinion that the wideband switch services now currently offered to certain businesses, hospitals, schools, and other institutions, would inevitably migrate to residential applications.  He noted that the FCC's recent "Video

---

[15]According to Drs. Jackson and Rohlfs, during 1987 through 1989, experts in their field were predicting that, in the telephone service industry as a whole, by the end of the century there would be a 10-to-20 percent penetration of fiber optic technology into the "copper loop" that connects customers to telephone company networks.

Dial Tone" ruling removed certain regulatory restrictions that prevented telephone companies from entering that business area. He opined that, although the time frame could not be well defined, it could take 5 to 10 years for serious penetration of the residential market for broadband switch services to occur.

The above expert opinions of Drs. Jackson and Rohlfs and Mr. Liss, along with the 1989 white paper Kyle authored, reflect that, during 1987 through 1989, NITCO's rewiring of residences with fiber optic cable and its purchase of broadband switches, would only become economically justified following the occurrence of future commercial, legal, and technological developments that would permit NITCO to derive substantial additional revenue from offering new services, such as television services, over fiber optic lines. NITCO's plans to employ broadband switches could hardly be considered to be specific and definite during the years in issue. We conclude that NITCO's future needs to install broadband switches and the fiber optic cable to support such switches, were too vague and uncertain to be reasonably anticipated business needs of NITCO during 1987 through 1989. Sec. 1.537-1(b)(1), Income Tax Regs.

Similarly, we are not convinced that NITCO, during 1987 through 1989, had any actual plans with respect to SS7/Class switches, "Airport risk", a billing and collections computer, and headquarters building expansion. As indicated above, we think that these purported business needs are mere afterthoughts on

petitioners' part, rather than actual future needs that NITCO anticipated and planned to meet during 1987 through 1989.  It was not until late 1992 and 1993 that petitioners first advised respondent's counsel that these asserted needs were among NITCO's alleged reasonable business needs.  Moreover, these asserted future needs were too vague and uncertain to be considered reasonably anticipated business needs of NITCO during 1987 through 1989.  Sec. 1.537-1(b)(1), Income Tax Regs.

With respect to possible telephone company acquisition and cellular telephone diversification, the record is not clear whether Mr. Mussman intended to have NITCO or individual members of the Mussman family, undertake and benefit from such activities or ventures.  Although NITCO applied for a cellular telephone license with respect to the Indiana RSA #1 area in 1988, the record reflects that Mr. Mussman's plan and intention was to transfer the cellular telephone license rights that were obtained to Serv-U-Cellular, another corporation that he and one or more of his sons, individually, would own.  Petitioners have failed to establish that telephone company acquisition and cellular telephone diversification were reasonable business needs of NITCO during 1987 through 1989.  Rule 142(a).

In conclusion, we find that NITCO's reasonable business needs, during 1987 through 1989, were as follows:

| Business Need | 1987 | 1988 | 1989 |
|---|---|---|---|
| Working capital | $75,569 | $278,646 | $190,312 |
| Retirement of long-term debt | 557,505 | 170,760 | -- |
| Fiber optic to the exchange | 300,000 | 100,000 | 100,000 |

Petitioners have failed to establish that NITCO, during these years, had reasonable business needs in excess of these amounts. Rule 142(a).

## NITCO's Liability for Accumulated Earnings Tax

For 1987, 1988, and 1989, NITCO's accumulated earnings and adjusted net liquid assets exceeded the reasonable needs of the business. NITCO is therefore presumed to have accumulated its earnings with the purpose of avoiding income tax with respect to its shareholders. Sec. 533(a).

NITCO has failed to rebut this presumption of proscribed purpose. Sec. 533(a); Technalysis Corp. v. Commissioner, 101 T.C. at 403. Indeed, the record in the instant cases reflects the existence of factors that strongly indicate NITCO had this proscribed purpose. NITCO engaged in extensive nonbusiness-related activities to benefit and support Mr. Mussman's two sons. NITCO made investments that were unrelated to its business. From 1954 through 1994, NITCO never declared and paid a formal dividend to its shareholders. See sec. 1.533-1(a)(2), Income Tax Regs. We hold that NITCO, for 1987, 1988, and 1989, is liable for accumulated earnings tax.

## II. NITCO's Deduction of Legal Expenses

On its 1987, 1988, and 1989 returns, NITCO claimed substantial business deductions for legal expenses. To be deductible by NITCO under section 162, NITCO must establish that these outlays were ordinary and necessary expenses incurred in carrying on NITCO's trade or business. However, before, during, and after the years in issue, NITCO engaged in extensive nonbusiness-related activities to benefit and support Mr. Mussman's sons.

Whether a taxpayer is engaged in a trade or business is a question of fact. Although there are various factors that are important in making this determination, the most prominent of these factors are a profit motive and the carrying on of activities in a businesslike fashion. See International Trading Co. v. Commissioner, 275 F.2d 578, 584-585 (7th Cir. 1960), affg. T.C. Memo. 1958-104.

In United States v. Gilmore, 372 U.S. 39, 48 (1963), the Supreme Court held legal expenses to be deductible if the claim arises in connection with the taxpayer's profit-seeking activities. In the words of the Supreme Court in Gilmore, "the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal'"; i.e., nonbusiness within the meaning of section 162(a). Id. at 49. In

the instant cases, application of the <u>Gilmore</u> origin-of-the-claim test is crucial because NITCO, while a corporation, engaged in various activities, some of which were business activities and others of which were nonbusiness activities. See <u>Accardo v. Commissioner</u>, 942 F.2d 444, 449-451 (7th Cir. 1991), affg. 94 T.C. 96, 99-100 (1990)

Implicit in the <u>Gilmore</u> test is the further requirement that, for an expenditure to be deductible under section 162, it must be an ordinary and necessary expense, directly connected with or proximately resulting from the taxpayer's business. <u>Kornhauser v. United States</u>, 276 U.S. 145, 153 (1928).

Petitioners contend that the disputed legal expenses NITCO incurred and paid, during the years in issue, are deductible ordinary and necessary business expenses under section 162. They argue that the litigation expenses with respect to the constitutional challenge, enforcement, and divestiture actions are deductible, because NITCO was a named party in the proceeding before the FCC, was the subject of the FCC's divestiture order, and was faced with the prospect of being fined or otherwise sanctioned by the FCC.

Respondent, on the other hand, contends that the disputed legal expenses are not deductible, because they fail to meet the <u>Gilmore</u> origin-of-the-claim test. Respondent maintains that the claims in the constitutional challenge, divestiture, and enforcement actions arose from nonbusiness activities that NITCO engaged in to benefit Mr. Mussman's son, Rhys, by assisting Rhys'

cable television company NICATV. Respondent also asserts that petitioners have failed to establish that the disputed legal expenses were directly connected with or proximately resulted from NITCO's business activities. We essentially agree with respondent.

We think that the mere naming of NITCO as a party in the FCC proceedings does not suffice to make the legal expenses deductible. The Synanon Church v. Commissioner, T.C. Memo. 1989-270.[16] In Gilmore, the Supreme Court noted:

---

[16]But cf. Kopp's Co. v. United States, 636 F.2d 59, 61 (4th Cir. 1980), where the Court of Appeals for the Fourth Circuit distinguished United States v. Gilmore, 372 U.S. 39 (1963), reversed the lower court's holding that the legal expense in dispute failed to meet the origin-of-the-claim test, and allowed the taxpayer-corporation to deduct certain legal expense. In Kopp's Co., the corporation incurred the legal expense in defending itself and a shareholder's son in a tort suit stemming from an accident involving a company car driven by the son. The son had not been a corporate employee, nor had he been engaged in performing corporate business. The court distinguished Gilmore on the basis that the taxpayer-corporation had been named as a party defendant and was alleged to have negligently permitted the son to operate its car. We think that Kopp's Co. v. United States is inapposite to the instant cases. Unlike the instant cases, the taxpayer-corporation in Kopp's Co. apparently engaged only in business activities. The activity giving rise to the lawsuit, although arguably unrelated to the taxpayer's business, was an isolated incident. In contrast, NITCO engaged in substantial nonbusiness activities before, during, and after the years in issue. Indeed, the precise activities giving rise to the proceedings in issue were NITCO's nonbusiness activities. For example, the FCC based its conclusion that NITCO and NICATV were affiliated, inter alia, upon the following nonbusiness activities: (1) NITCO's construction and maintenance of signal distribution facilities for NICATV, (2) Rhys' responsibility, while serving as NITCO's executive vice president, for negotiating pole attachment agreements with competing cable companies, (3) the fact that all contractual agreements between NITCO and NICATV were oral, and (4) Rhys' oral "consulting agreement".

"Legal expenses do not become deductible merely because they are paid for services which relieve a taxpayer of liability.  That argument would carry us too far.  It would mean that the expense of defending almost any claim would be deductible by a taxpayer on the ground that such defense was made to help him keep clear of liens whatever income-producing property he might have.  For example, it suggests that the expense of defending an action based upon personal injuries caused by a taxpayer's negligence while driving an automobile for pleasure should be deductible.  * * *

* * * * * * *

"It is not a ground for * * * [deduction] that the claim, if justified, will consume income-producing property of the defendant."  * * *  [United States v. Gilmore, 372 U.S. at 46-47 (quoting Lykes v. United States, 343 U.S. 118, 125-126 (1952)).]

Thus, the fact that NITCO may have been subject to being fined or otherwise sanctioned by the FCC is not controlling under the Gilmore origin-of-the-claim test, because those potential actions by the FCC concern only the attendant consequences of the litigation.

We have found that the activities that NITCO engaged in with respect to NICATV were not undertaken by NITCO with a profit motive.  Indeed, NITCO's 1989 annual report to the IURC reflects that NITCO wrote off the approximately $122,000 "debt" that NICATV "owed" to NITCO.  The purported debt was written off, despite the fact that Mr. Mussman knew that Rhys had realized sufficient cash from his sale of NICATV to discharge the "debt".  In addition, in its 1989 annual report to the IURC, NITCO stated

that the writeoff was not deductible for tax purposes.[17]  We conclude that the activities that NITCO engaged in with respect to NICATV were nonbusiness activities of NITCO.  See International Trading Co. v. Commissioner, 275 F.2d at 584-585. As the claim in the divestiture and enforcement actions arose in connection with these nonbusiness activities that NITCO engaged in with respect to NICATV, the legal expenses of the divestiture and enforcement actions are not deductible by NITCO under section 162.  See United States v. Gilmore, supra; Accardo v. Commissioner, supra; Dower v. United States, 668 F.2d 264, 266 (7th Cir. 1981); Anchor Coupling Co. v. United States, 427 F.2d 429, 431-433 (7th Cir. 1970).  Petitioners have further failed to establish that the constitutional challenge action arose in connection with or proximately resulted from a business activity

---

[17]At trial, Mr. Mussman claimed that the writeoff occurred due to an inadvertent error on the part of NITCO's accountant. He related that the accountant, unlike Mr. Mussman, did not know that Rhys had realized sufficient cash from the sale of NICATV to discharge the "debt".  We find Mr. Mussman's tale of mere inadvertence to be incredible and not worthy of belief.  We doubt that the accountant would write off as uncollectible this large $122,000 "receivable", without consulting Mr. Mussman and NITCO's other top management.  Moreover, even if the "receivable" were inadvertently written off on NITCO's books, this still does not adequately explain why NITCO never took action to collect the "debt", as Mr. Mussman knew that Rhys possessed sufficient cash to discharge the "debt".  Additionally, we are not convinced that Mr. Mussman was unaware of the accountant's "error".  In signing NITCO's 1989 annual report to the IURC, Mr. Mussman represented that the information contained in the report, to the best of his knowledge, was true and correct under penalty of perjury.  We think that Mr. Mussman all along never intended that NITCO actually be paid by NICATV and Rhys for much of the work and other assistance that NITCO provided to NICATV.

of NITCO.[18]  The legal expenses incurred in the constitutional

challenge action are thus not deductible by NITCO under section

162.  United States v. Gilmore, supra; Kornhauser v. United

States, supra.

Similarly, petitioners have failed to establish that the RSA

#1, Dial One Mobile, Dial One USA, Sprint contract, and Postal

Service investigation matters arose in connection with or

proximately resulted from a business activity of NITCO.  With

respect to the RSA #1 venture, Mr. Mussman's intention and plan

was to have the cellular license rights that were obtained

transferred to Serv-U-Cellular, a corporation that he and one or

more of his sons, individually, would own.  Much of this plan was

then implemented with Serv-U-Cellular, rather than NITCO,

becoming a partner in the RSA #1 limited partnership.  NITCO

reported on its return substantially all the $750,000 paid to

Serv-U-Cellular only after Mr. Mussman was forced to abandon the

plan as a result of the examinations that resulted in

respondent's issuances of the notices of deficiency in the

instant cases.  With respect to the Dial One Mobile matters, Dial

One Mobile was a company owned by Rhys that was conducting

activities with respect to cellular telephone systems in

---

[18]From petitioners' briefs, we gather that they are not
contending that the claim in the constitutional challenge action
arose in connection with Rhys' alleged desire to purchase shares
of NITCO's stock from Mr. Mussman.  As we understand their
contentions, the constitutional challenge action was brought by
Rhys and NITCO in order to challenge the constitutionality of the
FCC's cross-ownership rules, as the constitutional issues could
not be litigated in the divestiture action.

Asheville, North Carolina, and Enid, Oklahoma.  NITCO had no interest in Dial One Mobile.  According to the application that Dial One USA filed with the IURC to sell long-distance services, NITCO had no interest in Dial One USA.  The Postal Service investigation matter involved a seizure of NICATV's records from NICATV's business offices.  Accordingly, the legal expenses that NITCO incurred in the RSA #1, Dial One Mobile, Dial One USA, Sprint contract, and Postal Service investigation matters are not deductible under section 162.  United States v. Gilmore, supra; Kornhauser v. United States, supra.

Finally, petitioners have failed to establish that the legal expenses incurred in certain other unknown matters or proceedings arose in connection with or were proximately related to a business activity of NITCO.  Therefore, the legal expenses that NITCO incurred in these unknown matters or proceedings are not deductible under section 162.  United States v. Gilmore, supra; Kornhauser v. United States, supra.

In conclusion, with respect to the legal expenses for which NITCO claimed 1987, 1988, and 1989 business deductions, we hold that only those legal expenses that respondent has conceded are deductible by NITCO under section 162.

### III.  Constructive Dividend Income

In the notice of deficiency issued to Mr. and Mrs. Mussman, respondent determined that certain payments made by NITCO represented constructive dividend income to Mr. Mussman for 1988

and 1989.  It is well established that a payment made to a shareholder's family member can constitute a section 301 distribution by a corporation with respect to the stock of the shareholder.  Green v. United States, 460 F.2d 412, 419 (5th Cir. 1972); Epstein v. Commissioner, 53 T.C. 459, 474-475 (1969). Under proper circumstances, it is appropriate to hold that a corporate payment made to or on behalf of a shareholder's family member represents a distribution by the corporation to the shareholder, because the shareholder enjoys the use of the property as much as if the corporation had distributed the property directly to the shareholder.  Epstein v. Commissioner, supra.  In determining whether an expenditure by a corporation represents income to the shareholder, it is necessary to decide whether the expenditure primarily benefited the shareholder personally rather than furthered the interest of the corporation. Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. on this issue T.C. Memo. 1987-549; Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980).

Legal Expenses for which Respondent Disallowed Business Deductions to NITCO

In the notice of deficiency issued to the Mussmans, respondent determined that the legal expenses for which respondent disallowed business deductions to NITCO for 1988 and 1989 represented constructive dividend income to Mr. Mussman. Respondent further determined that these legal expenses were

unrelated to NITCO's business.

We previously have held that substantially all these legal expenses were not deductible under section 162 by NITCO, because petitioners failed to establish the expenses were deductible under the Gilmore origin-of-the-claim test. Most of these legal expenses were incurred in the constitutional challenge, divestiture, and enforcement actions discussed supra.

To the extent a substantive difference exists between the Gilmore origin-of-the-claim test discussed at pages 67-68, supra, and the analysis for whether a particular payment should be treated as constructive dividend income, petitioners in the instant cases have failed to meet their burden in proving that NITCO's payment of the legal expenses: (1) Did not primarily benefit Mr. Mussman's son Rhys, (2) furthered the interest of NITCO, and (3) was of direct and substantial economic benefit to NITCO. Compare Hagaman v. Commissioner, supra, and Ireland v. United States, supra, with Parker v. Commissioner, 365 F.2d 792, 801-802 (8th Cir 1966), affg. in part, revg. in part, and remanding T.C. Memo. 1965-77.[19]

_____

[19]In Parker v. Commissioner, 365 F.2d 792, 801-802 (8th Cir. 1966), affg. in part, revg. in part, and remanding Foundation for Divine Meditation, Inc. v. Commissioner, T.C. Memo. 1965-77, the founder and head of a religious organization was prosecuted for contributing to the delinquency of a minor. Following his acquittal, he brought an action for slander. The religious organization paid the expenses of both the criminal and civil actions. This Court viewed the legal expenses as a personal expense of the founder and held that their payment by the organization represented taxable income to the founder. In reversing, the Court of Appeals for the Eighth Circuit stated

(continued...)

With respect to the legal expenditures for the constitutional challenge, divestiture, and enforcement actions, petitioners contend the expenditures directly benefited NITCO, because they prevented NITCO from being subjected to a fine and protected its business reputation with the FCC.

We consider the hundreds of thousands of dollars in legal expenditures that NITCO incurred in litigating the constitutional challenge, divestiture, and enforcement actions, to have been of dubious benefit to NITCO and its business, particularly since, as indicated above, the activities that NITCO engaged in with respect to NICATV were not undertaken by NITCO with a profit motive. We are thus not convinced that the litigation of the constitutional challenge, divestiture, and enforcement actions furthered NITCO's interest and was of direct and substantial benefit to NITCO. Rather, the litigation primarily benefited Rhys, by giving Rhys' company NICATV the further time it needed to build up its cable television system business.

Moreover, we perceive the protracted litigation to have been actually more harmful to NITCO's good reputation with the FCC,

---

[19](...continued)
that because the reputation and business of the organization were inextricably bound up with its founder, the payment of the expenses was of direct and substantial benefit to the organization. Although the Court of Appeals for the Eighth Circuit further stated, in dicta, that the expenses would be deductible by the organization as an ordinary and necessary business expense, the issue of the expenses' deductibility had not been raised. Thus, the Court of Appeals for the Eighth Circuit did not have the deductibility issue before it and did not address the Gilmore origin-of-the-claim test.

rather than helpful.  In view of NICATV's and NITCO's refusal to comply with the FCC's orders in the divestiture action, the FCC referred the matter to the Department of Justice for appropriate enforcement proceedings.  Ultimately, in July 1989, Rhys sold NICATV.

With respect to the legal expenses for which we sustained respondent's disallowance of business deductions by NITCO for 1988 and 1989, we sustain respondent's determination that NITCO's payment of those legal expenses represented constructive dividend income to Mr. Mussman for 1988 and 1989.  Petitioners have failed to establish that NITCO's payment of the expenses did not primarily benefit the Mussman family, furthered NITCO's interest, and was of direct and substantial benefit to NITCO.  Rule 142(a).

## Amount NITCO Paid to Rhys on December 20, 1988

In the notice of deficiency issued to the Mussmans, respondent determined that $22,646, which NITCO paid to Rhys on December 20, 1988, was constructive dividend income to Mr. Mussman.  On brief, petitioners have advanced only a vague argument that Rhys served as a "consultant" to NITCO in 1985 and in 1989.

Petitioners have failed to establish that the payment furthered NITCO's interest and was of direct and substantial benefit to NITCO.  They have not offered any details or specific information concerning what, if any, actual "consulting work" Rhys performed for NITCO.  Indeed, in NITCO and Rhys' March 24,

1988, complaint in the constitutional challenge action, they alleged that Rhys received no compensation from NITCO and had no formal responsibilities at NITCO. We hold that the $22,646 payment was constructive dividend income to Mr. Mussman in 1988. Rule 142(a).

"Open Account Loans"

NITCO on its books recorded certain payments that it had made as "open loan account payments" to Mr. Mussman. In the notice of deficiency issued to the Mussmans, respondent determined that $13,814 in "open account loans" that NITCO made for 1988 and $16,792 in "open account loans" that NITCO made for 1989, represented constructive dividend income to Mr. Mussman. Respondent has now conceded that certain of the 1988 and 1989 payments NITCO made were not constructive dividend income to Mr. Mussman. Petitioners, on the other hand, have conceded that certain other of the 1988 and 1989 payments NITCO made were constructive dividend income to Mr. Mussman. Still at issue between the parties is whether the remaining $7,058.11 of 1988 "open account loans" and the remaining $3,263.51 of 1989 "open account loans" were constructive dividend income to Mr. Mussman.

Of the remaining $7,058.11 in disputed 1988 payments, the parties agree that at least $6,119.95 of the payments was for utility bills with respect to the 301 North Washington Street property that NITCO was subleasing to NICATV, Rhys's cable television company. The parties cannot agree on the

identification of the balance of the disputed 1988 payments. Similarly, of the remaining $3,263.51 of disputed 1989 payments, the parties agree that the entire $3,263.51 was paid by NITCO for utility bills with respect to the 301 North Washington Street property that NITCO was subleasing to NICATV. All the 1989 utility bill expenses covered the period from January 1 through June 30, 1989, when NICATV occupied the 301 North Washington Street building.

We have previously determined that NITCO's activities with respect to NICATV were not undertaken by NITCO with a profit motive. Petitioners, however, contend that NITCO's payments of the utility bills directly benefited NITCO, because NITCO also stored certain telephone equipment in the 301 North Washington Street building.

Mr. Mussman testified that NITCO paid these utility bills because it had stored some of its telephone equipment in the 301 North Washington Street building that it was subleasing to NICATV. The revenue agent, however, testified that, during his visit to the building during the fall of 1992, he found only a few pieces of office furniture stored there. On brief, petitioners have tried to explain this conflict by claiming the agent was only able to observe the space in the building to which he was given access. More importantly, however, petitioners have failed to adequately explain why the utility bill payments were recorded as "open account loans" to Mr. Mussman if the payments were, in fact, business expenses of NITCO.

We conclude that petitioners have failed to establish that these 1988 and 1989 utility bill payments with respect to the 301 Washington Street property furthered NITCO's interest and were of direct and substantial benefit to NITCO. The payments primarily benefited Rhys and NICATV. On the record presented, we also are not able to determine the extent of the storage use NITCO made of the building. We decline to speculate and allocate a portion of the utility bill payments to a business use of NITCO.[20] Petitioners have further failed to establish that the remaining balance of the disputed 1988 "open account loans" furthered NITCO's interest and directly and substantially benefited NITCO. We hold that Mr. Mussman had constructive dividend income of $7,058.11 for 1988 and $3,263.51 for 1989, as a result of the "open account loans".[21]

Country Club Initiation Fee

In early 1989, NITCO paid an $1,800 initiation fee on behalf of Rhys to obtain a country club membership for Rhys. Petitioners have acknowledged that Rhys was not a NITCO employee until after July 1, 1989. However, they argue that the club

---

[20]The utility bill payments were for electricity, gas, sewage, and water services provided to the 301 Washington Street property. To the extent that NITCO made some incidental use of the building for storage, it is difficult to quantify the actual benefit that resulted to NITCO from the payments.

[21]From petitioners' arguments in their posttrial briefs concerning this issue, we gather that petitioners are not contending that NITCO had made a bona fide loan to Mr. Mussman with respect to these payments.

membership was purchased in anticipation of Rhys' returning to NITCO's employ, because a waiting list existed at the country club for memberships. They assert that, following his resumption of employment with NITCO, the membership would be used by Rhys in connection with NITCO's business activities.

In view of the substantial expenditures NITCO made for NICATV's and Rhys' benefit that we have held to be constructive dividend income to Mr. Mussman, we are extremely skeptical of petitioners' claims with respect to NITCO's payment of the club initiation fee for Rhys. Petitioners have failed to establish that the expenditure was a business expenditure of NITCO, rather than constructive dividend income to Mr. Mussman. Consequently, we sustain respondent's determination that the $1,800 expenditure to obtain a country club membership for Rhys was constructive dividend income to Mr. Mussman. Rule 142(a).

Cellular Telephone and Other Investments

In the notice of deficiency issued to the Mussmans, respondent determined that $88,484 of legal expenditures that NITCO made with respect to certain "cellular telephone and other investments" was constructive dividend income to Mr. Mussman in 1989. NITCO claimed no deduction for these expenditures.

Petitioners contend that a substantial portion of the $88,484 in total expenditures was actually paid by NITCO in 1988, rather than in 1989, and that these 1988 payments were erroneously determined by respondent to be constructive dividend

income to Mr. Mussman in 1989.  They point out that in the notice of deficiency issued to the Mussmans, respondent failed to treat any portion of the $88,484 in payments as dividend income to Mr. Mussman in 1988.  They assert that the $75,432 of cellular telephone investment account expenditures NITCO recorded includes $33,445.68 in payments made by NITCO in 1988.  Similarly, they assert that the $13,052 of other investment account expenditures NITCO recorded includes $9,562.42 in payments NITCO made in 1988.  Respondent, on the other hand, disputes that any of the $88,484 in expenditures was made by NITCO during 1988.

The record does not support petitioners' claim that the $88,484 in expenditures includes cellular telephone expenditures that were made by NITCO during 1988, rather than during 1989.  In the Schedule B-8 to the 1989 annual report it filed with the IURC, NITCO reported that it had $75,342 of "deferred cellular charges" and $13,052 of deferred "other" charges.  Yet, in the Schedule B-8 to the 1988 annual report it filed with the IURC, NITCO reported that it had $390,000 of "extraordinary retirements" and $39,599 of deferred "other" charges.  The Schedule B-8 to the 1988 report reflected no "deferred cellular charges" for 1988.  We conclude that petitioners have failed to establish that the $88,484 in expenditures includes payments that were made by NITCO in 1988.

At pages 39-40, supra, of our findings, we have attempted to allocate and attribute the $88,484 of expenditures to specific matters as best as we can on the record presented.  We

essentially have attributed the $88,484 only to those specific matters the parties agree upon.

With respect to the $1,166.59 NITCO expended to Andrew & Kurth for Dial One Mobile, petitioners have conceded that the payment was constructive dividend income to Mr. Mussman in 1989, and we so hold. NITCO also expended $32,363.64 to B&H for Dial One Mobile work. Dial One Mobile was a company Rhys owned, which was conducting activities with respect to cellular telephone systems in Asheville, North Carolina, and Enid, Oklahoma. NITCO had no interest in Dial One Mobile. Petitioners have failed to show that the payment was of direct and substantial benefit to NITCO. We hold that the $32,363.64 in payments made to B&H was constructive dividend income to Mr. Mussman for 1989.

With respect to the $3,327.50 NITCO expended to EMCI for cellular telephone publications, it is not clear whether the cellular telephone publications were purchased and used to benefit NITCO, as opposed to individual members of the Mussman family. Petitioners have failed to establish that the expenditure furthered NITCO's interest and was of direct and substantial benefit to NITCO. We hold that the $3,327.50 payment was constructive dividend income to Mr. Mussman in 1989. Rule 142(a).

With respect to the expenditures NITCO made to Handlon & Handlon for various matters, petitioners concede that a $264 payment was for work performed for Kyle's corporation, FiberComm, and that such payment was constructive dividend income to Mr.

Mussman for 1989.  As to the remaining balance of the expenditures NITCO made to Handlon & Handlon, petitioners have failed to establish that these payments furthered NITCO's interest and were of direct and substantial benefit to NITCO.

NITCO paid Handlon & Handlon $1,525.81 for work with respect to Dial One USA and Intelcom, which were corporations that Mr. Mussman owned.  According to the 1988 application that Dial One USA filed with the IURC in seeking authorization to sell long-distance services, NITCO had no affiliation with Dial One USA and Intelcom.  Although Mr. Mussman, at trial, claimed that he later planned to have Intelcom become the parent holding company of Dial One USA and NITCO, we do not find his self-serving testimony credible, as this testimony is inconsistent with the statements made on Dial One USA's application to the IURC.

NITCO also paid Handlon & Handlon $234 for the incorporation of Northwestern Indiana Cellular, a corporation formed to hold various cellular telephone interests.  On the record presented, it is not clear whether Mr. Mussman intended that Northwestern Indiana Cellular be owned by NITCO or by individual members of the Mussman family.  It is also not clear whether the cellular telephone interests Mr. Mussman planned to have held by Northwestern Indiana Cellular would be cellular telephone interests that NITCO or individual members of the Mussman family owned.

We hold that the entire $2,120.81 in the above payments that NITCO made to Handlon & Handlon, including the $229 expended for

an unknown matter, was constructive dividend income to Mr. Mussman for 1989.

With respect to the expenditures NITCO made to LMN&G, petitioners concede that $4,400 was constructive dividend income to Mr. Mussman in 1989. As to the work LMN&G performed in connection with the Indiana RSA #1 venture and for Rhys, petitioners have failed to establish that NITCO's payment for the work furthered NITCO's interest and was of direct and substantial benefit to NITCO. As we have found, Mr. Mussman intended and planned to have the cellular telephone rights held by Serv-U-Cellular, a corporation that he and one or more of his sons, individually, would own. Rhys was not an employee of NITCO until after July 1, 1989, and the work LMN&G performed for Rhys was billed before that date. Consequently, we hold that all the expenditures that NITCO made to LMN&G were constructive dividend income to Mr. Mussman for 1989. Rule 142(a).

With respect to the balance of NITCO's expenditures that has not been attributed to specific matters, petitioners have failed to establish that these payments furthered NITCO's interest and were of direct and substantial benefit to NITCO. Consequently, we hold that these payments were constructive dividend income to Mr. Mussman for 1989.[22] Rule 142(a).

---

[22]These constructive dividends to Mr. Mussman, of course, will increase NITCO's dividend paid deduction in computing NITCO's accumulated earnings tax liability. See sec. 535(a).

## IV. Additions to Tax

Sections 6653(a) and 6662 Additions For Negligence Or Intentional Disregard of Rules and Regulations

In the notice of deficiency issued to NITCO, respondent determined that NITCO was liable for additions to tax for negligence or intentional disregard of rules or regulations (1) under section 6653(a), equal to 5 percent of the respective underpayments for 1987 and 1988, and (2) under section 6662, equal to 20 percent of a portion of the underpayment for 1989. Respondent determined that the 20-percent addition under section 6662 should apply with respect to a $117,547 portion of the underpayment for 1989. Respondent further determined that NITCO was liable for an addition to tax under section 6653(a)(1)(B) for 1987. Under section 6653(a)(1)(B), an addition to tax (equal to 50 percent of the interest payable under section 6601) is imposed with respect to the portion of the underpayment attributable to negligence. Respondent determined that the portion of the 1987 underpayment resulting from NITCO's improper deduction of $467,673 in legal expenses was attributable to negligence on NITCO's part.

In the notice of deficiency issued to the Mussmans, respondent determined the Mussmans were liable for additions to tax for negligence or intentional disregard of rules or regulations (1) under section 6653(a), equal to 5 percent of the underpayment for 1988, and (2) under section 6662, equal to 20

percent of the underpayment for 1989. Respondent determined that the 20-percent addition under section 6662 should apply with respect to the entire underpayment for 1989.

Negligence has been defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of showing that they are not negligent. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Petitioners argue that NITCO and the Mussmans are not liable for additions to tax for negligence. Their contentions are as follows:

> Respondent has not rebutted any of the facts supporting the reasonableness of NITCO's accumulations. Imposition of the * * * [accumulated earnings tax] and any additional penalty is therefore unwarranted. Similarly, imposing penalties for deducting the allegedly nondeductible attorneys' fees and other costs attributable to billing errors by outside attorneys or oversight by the independent accountant would also be improper. None of any underpayment ultimately determined is attributable to negligence or intentional disregard. * * *

We have previously held that NITCO is liable for accumulated earnings tax for 1987, 1988, and 1989, because NITCO accumulated its earnings beyond the reasonable needs of the business and was availed of for the purpose of avoiding income tax with respect to its shareholders. We further held that, for 1987, 1988, and 1989, substantial business deductions for legal expenses that NITCO claimed were not allowable to NITCO under section 162,

because the expenditures failed to meet the <u>Gilmore</u> origin-of-the-claim test.  We also held that Mr. Mussman had large amounts of constructive dividend income for 1988 and 1989, including the 1988 and 1989 legal expenses NITCO had paid in litigating the constitutional challenge, divestiture, and enforcement actions.

Petitioners have failed to establish:  (1) NITCO acted reasonably in claiming deductions for these legal expenses; and (2) the Mussmans acted reasonably in not reporting NITCO's payments of the 1988 and 1989 legal expenses as constructive dividend income to Mr. Mussman.  Petitioners imply that the attorneys' fees in the constitutional challenge, divestiture, and enforcement actions were deducted because the outside law firms had billed their work to NITCO, rather than to Rhys and NICATV. We are not convinced that NITCO acted reasonably in deducting the fees it paid merely because the work had been billed to NITCO. Indeed, in one instance NITCO still claimed a 1989 deduction with respect to its payment of $2,239.85 to W&C for certain Dial One Mobile work, even though W&C billed the legal work to Rhys and not to NITCO.  Petitioners have now conceded that the $2,239.85 payment is not deductible by NITCO and was constructive dividend income to Mr. Mussman.

With respect to the purported advice petitioners received from the accountant, we are not satisfied that the accountant was apprised of all the relevant facts, including the fact that the activities NITCO engaged in with respect to NICATV were not undertaken by NITCO with a profit motive.  See <u>Collins v.</u>

Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217.  The record fails to disclose what specifically the accountant was told or was not told by NITCO and Mr. Mussman.

Although reliance on the advice of qualified professional advisers may defeat a finding of negligence under certain circumstances, petitioners have not established that the reliance in the instant cases was reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners generally have failed to carry their burden in establishing that all or parts of their respective underpayments were not attributable to negligence.  Rule 142(a).

We hold that NITCO is liable for additions to tax for negligence (1) under section 6653(a)(1)(A) and (B), for 1987 and 1988, and (2) under section 6662 for 1989.  The section 6662 addition applies with respect to that part of the $117,547 portion of the underpayment for 1989 that respondent determined to be attributable to negligence or intentional disregard of rules or regulations, which we have sustained.  We further hold that NITCO will be liable for an addition to tax under section 6653(a)(1)(B) for 1987 with respect to the portion of the underpayment for 1987 attributable to NITCO's improper deduction of certain legal expenses.

Similarly, we hold that the Mussmans are liable for additions to tax for negligence (1) under section 6653(a) for

1988 and (2) under section 6662 for 1989. The section 6662 addition applies with respect to the entire underpayment for 1989.

Section 6661 Additions for Substantial Understatement

In the notice of deficiency issued to NITCO, respondent determined that NITCO was liable for additions to tax for substantial understatement of income tax liability under section 6661 for 1987 and 1988. In the notice of deficiency issued to the Mussmans, respondent determined the Mussmans were liable for an addition to tax for substantial understatement under section 6661 for 1988.

Section 6661 provides for an addition to tax for substantial understatement of income tax equal to 25 percent of the amount of the underpayment attributable to such understatement for the taxable year. To be considered substantial, the understatement must exceed the greater of $5,000 ($10,000 in the case of a corporation like NITCO) or 10 percent of the tax required to be shown on the return. Sec. 6661(b)(1). The amount of the understatement is reduced by the portion of the understatement attributable to any nontax shelter item for which there is either substantial authority for the taxpayer's return position or adequate disclosure on the return. Sec. 6661(b)(2)(B).

NITCO understated its tax for 1987 and 1988; the Mussmans understated their tax for 1988. These respective understatements were substantial. Petitioners have not asserted that the

understatements should be reduced under section 6661(b)(2)(B) or that respondent should have waived all or any part of the additions to tax under section 6661(c).[23]  We hold that NITCO is liable for additions to tax under section 6661 for 1987 and 1988 and that the Mussmans are liable for an addition to tax under section 6661 for 1988.

Decisions will be entered

under Rule 155.

---

[23]On brief, petitioners make the vague argument that they should not be held liable for the sec. 6661 additions to tax, because "the substantial understatement penalty is computational, and thus may not apply; if it does, the penalty is inappropriate because reasonable cause can be found for the understatement." However, "reasonable cause", standing alone, is not a sufficient basis for avoiding liability with respect to the sec. 6661 addition.  See H. Conf. Rept. 97-760 at 575 (1982), 1982-2 C.B. 600, 650.  At any rate, petitioners have failed to establish: (1) There was substantial authority for their return positions or reasonable disclosure on their returns; or (2) respondent should have waived all or part of the additions.  Rule 142(a).